**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PATRICIA GUNNING,**

                              **Plaintiff,**

                    **v.**

**NEW YORK STATE JUSTICE**
**CENTER FOR THE PROTECTION**
**OF PEOPLE WITH SPECIAL**
**NEEDS et al.,**

                              **Defendants.**
_____

**1:19-cv-1446**
**(GLS/CFH)**

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Watkins Law                         CHRISTOPHER D. WATKINS,
5 Paradies Lane                     ESQ.
New Paltz, NY 12561

Bergstein & Ullrich, LLP            STEPHEN BERGSTEIN, ESQ.
5 Paradies Lane
New Paltz, NY 12561

**FOR THE DEFENDANTS:**
*New York State Justice Center for*
*the Protection of People With*
*Special Needs*
Girvin & Ferlazzo, P.C.             PATRICK J. FITZGERALD, III,
20 Corporate Woods Boulevard        ESQ.
Albany, NY 12211-2350               SCOTT P. QUESNEL, ESQ.

*James Kiyonaga*
O'Connell, Aronowitz Law Firm        MEREDITH H. SAVITT, ESQ.
54 State Street, 9th Floor
Albany, NY 12207-2501

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Patricia Gunning commenced this action against defendants

New York State Justice Center for the Protection of People With Special

Needs (hereinafter "the Justice Center") and James Kiyonaga pursuant to

Title VII[1] and 42 U.S.C. § 1983.  (Compl., Dkt. No. 4.)  Pending are

defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt.

Nos. 44, 46.)  For the reasons that follow, the Justice Center's and

Kiyonaga's motions are granted in part and denied in part.

### II. Background

**A.   Facts**[2]

In June 2013, Gunning was appointed to the position of Special

Prosecutor/Inspector General at the Justice Center.  (Compl. ¶ 9.)  In this

role, Gunning oversaw a "large team," including "three units that were set

up to ensure the quality of care in facilities under the Justice Center's

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] The facts are drawn from Gunning's complaint, (Dkt. No. 4), and presented in the light most favorable to her.

jurisdiction." (*Id.* ¶ 11.)  Kiyonaga, as Deputy Executive Director of the

Justice Center, and later as Acting Executive Director, was Gunning's

direct supervisor.  (*Id.* ¶ 12.)

Kiyonaga "regularly subjected [Gunning] to unwanted and offensive

sexualized comments."  (*Id.* ¶ 21.)  For instance, Kiyonaga told Gunning

"she hired 'hot' female employees," and "rated the attractiveness of her

staff," (*id.* ¶ 22); he "commented on female hires whom he did not find

attractive," (*id.*); after finding out that one of Gunning's "direct reports is

bisexual," he told her he found that to be "fucking hot," (*id.* ¶ 23); he

"wondered aloud to [Gunning] if he would 'get laid' by his wife after she saw

the movie 'Fifty Shades of Grey' without him," (*id.* ¶ 24); and he "fixated" on

the "sexual proclivities" of "prosecuted offenders who had sexually abused

children or the disabled," and asked Gunning "repeatedly what made

someone 'get off' on having sex with a child or a vulnerable disabled

person," (*id.* ¶ 25).

Kiyonaga also "appeared to openly pursue[] a sexual relationship with

a female Justice Center subordinate employee, 'D.L.,'" (*id.* ¶ 27), whom he

would often socialize with and keep in his office for hours, alone, with the

door closed, (*id.* ¶ 28).  Kiyonaga changed policy and procedure at the

Justice Center "to benefit D.L. at the expense of other employees, including by promoting her to a high-level position for which she was not qualified." (*Id.* ¶ 29.)

In July 2015, Gunning "raised concerns" about Kiyonaga's relationship with D.L. to both Kiyonaga as well as the Justice Center's then-Executive Director.  (*Id.* ¶¶ 30-31.)  "Within a few months" of this "complaint," Kiyonaga began to retaliate against Gunning.  (*Id.* ¶¶ 33-34.) For instance, he "exclude[d] her from high-level meetings that were squarely within her job responsibilit[ies], changed her staff without consulting with her, and threatened to take away her staff's offices."  (*Id.* ¶ 34.)  In addition, he "acted personally hostile toward[s] her," including instances where he would yell at her.  (*Id.* ¶ 35.)

In June 2016, Gunning "reported Kiyonaga's retaliatory and abusive conduct" to the Justice Center's general counsel and its ethics officer. (*Id.* ¶ 40.)  After making this complaint, the retaliation "only intensified."  (*Id.* ¶ 53.)

"In October 2016, Kiyonaga removed from [Gunning's] jurisdiction her entire [a]udit and [r]eview unit, an essential part of her role as the agency's Inspector General," (*id.* ¶ 54); he "barred [Gunning] from speaking to

4

agencies and groups that had invited her to speak about the Justice

Center," even though "she had made such speeches during the entirety of

her tenure at the Justice Center," (*id.* ¶ 55); he "repeatedly undermined her

authority" and "spoke disparagingly about" her to the new executive

director, Denise Miranda, (*id.* ¶ 56); and, after transferring herself to the

agency's Bronx office, Kiyonaga "directed staff not to provide [Gunning]

with an office in Albany," and "refused to allow [her] to use her old Albany

office when she was there," and, instead, made her sit in a cubicle, (*id.*

¶¶ 60-63).

On August 1, 2017, "based largely on Kiyonaga's negative feedback

about [Gunning], . . . Miranda told [Gunning] she had five minutes to resign

or she would be fired."  (*Id.* ¶ 65.)  "Based on this ultimatum, [Gunning]

involuntarily resigned."  (*Id.* ¶ 66.)

**B.**   **Procedural History**

In May 2018, Gunning filed a formal charge of discrimination with the

Equal Employment Opportunity Commission (EEOC), and received a right

to sue letter from the EEOC on or about March 21, 2019.  (Compl. ¶ 6.)

Gunning commenced this action on June 17, 2019.  (Compl.)  She

asserts a Title VII retaliation claim against the Justice Center, and a

5

retaliation claim pursuant to the Equal Protection Clause against Kiyonaga. (*Id.* ¶¶ 72-73.)  Although not specifically enumerated in the complaint, all parties appear to assume that a hostile work environment claim has also been alleged.  (Dkt. No. 46, Attach. 1 at 14-15; Dkt. No. 47 at 11-14; Dkt. No. 48 at 1-6.)  Accordingly, in addition to Gunning's retaliation claim, the court will address a hostile work environment claim, pursuant to Title VII, as against the Justice Center, and pursuant to Section 1983, as against Kiyonaga.

### III.  **Standard of Review**

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

### IV.  **Discussion**

**A.**    **The Justice Center's Motion**

Gunning alleges that the Justice Center violated Title VII "by subjecting her to sex-based discrimination and retaliation for having complained about sex-based discrimination, culminating in the termination of her employment."  (Compl. ¶ 72.)  The Justice Center seeks dismissal in

6

five respects.  First, the Justice Center argues that Gunning's EEOC charge was untimely, because she was required to file it within 180 days, not 300 days, from her August 1, 2017 termination.  (Dkt. No. 46, Attach. 1 at 3-12.)  Second, the Justice Center asserts that, although the 300th day from her termination fell on a national holiday, such holiday should not have extended her time to file by one business day.  (*Id.* at 12-13.)  Third, the Justice Center contends that the EEOC charge was invalid because it was notarized by a New Jersey notary public and the verification page contained a reference to "New York, New York" on a line above Gunning's signature.  (*Id.* at 13-14.)  Fourth, the Justice Center argues that Gunning's hostile work environment claim must be dismissed because she does not allege any acts which could give rise to such a claim that occurred within 300 days before she filed her EEOC charge.  (*Id.* at 14-15.)  Lastly, the Justice Center asserts that Gunning's "retaliation claim must be limited to acts of alleged retaliation that occurred no more than 300 days before she filed her EEOC charge."  (*Id.* at 15-17.)  In response, Gunning maintains that these arguments lack factual and legal support.  (Dkt. No. 47 at 6-13.) Each of the Justice Center's arguments in support of dismissal are addressed in turn below.

### 1.    180-Day Rule/300-Day Rule

"As a predicate to filing suit under [Title VII], a private plaintiff must first file a timely charge with the EEOC."  *Riddle v. Citigroup*, 449 F. App'x 66, 69 (2d Cir. 2011) (citations omitted).  Section 2000e-5(e)(1) of Title 42 of the United States Code requires that a charge of unlawful employment practices be made within 180 days of its occurrence[3] to the EEOC unless "the person aggrieved has initially instituted proceedings with a State or local agency," in which case a charge must be filed within 300 days of the occurrence.  42 U.S.C. § 2000e-5(e)(1).  In New York, however, the 300-day limit applies automatically given the relationship between the EEOC and New York State Division of Human Rights.  *See Shums v. N.Y.C. Dep't of Educ.*, No. 04-CV-4589, 2006 WL 8437471, at *5 n.2 (E.D.N.Y. Apr. 3, 2006); *see also Burns v. Cnty. of Schenectady*, No. 07-CV-0776, 2009 WL 2568546, at *3 (N.D.N.Y. Aug. 18, 2009); *accord Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325-26 (2d Cir. 1999);

---

[3] The date of the occurrence of a discriminatory act depends on whether it can be fairly described as a discrete unlawful act or part of a continuing violation.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.101, 113-14 (2002).  Accordingly, where the complained of conduct is part of a pattern of conduct that collectively creates an actionable claim, such as a hostile work environment claim, the claim is timely "if the plaintiff allege[s] . . . some non-time-barred acts contributing to the alleged violation."  *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (internal quotation marks and citation omitted).

*but see Palummo v. St. Vincent's Med. Ctr.*, 4 F. App'x 99, 101 n.1 (2d Cir.

2001) (indicating that the 300-day limit applies only if the plaintiff "has filed

a charge [directly] with a state agency").

Here, the Justice Center argues only that Gunning failed to file a

charge with the EEOC within 180 days.  (Dkt. No. 46, Attach. 1 at 3-12.)

This argument mistakenly presumes that the 180-day rule applies and,

therefore, dismissal on this basis is not warranted.

    *2.   Timeliness of Gunning's EEOC Complaint*

"[D]istrict courts that have addressed the proper calculation method

for timeliness of an EEOC complaint in a federal discrimination action have

employed . . . Fed. R. Civ. P. [6(a)]."  *Bagley v. Yale Univ*., 42 F. Supp. 3d

332, 334-35 (D. Conn. 2014) (citations omitted).  Pursuant to this rule,

holidays and weekends are included in the calculation, *see* Fed. R. Civ. P.

6(a)(1)(B), "but if the last day is a . . . legal holiday, the period continues to

run until the end of the next day that is not a . . . legal holiday," Fed. R.

Civ. P. 6(a)(1)(C).

Here, the last alleged act of discrimination or retaliation identified in

Gunning's complaint occurred on August 1, 2017.  (Compl. ¶¶ 65-66.)

Gunning's EEOC complaint was marked "Date Received" on May 29, 2018,

301 days after August 1, 2017.  (Dkt. No. 46, Attach. 3.)  The EEOC filing

was timely under the 300-day limit because May 28, 2018 was a holiday,

and, therefore, Gunning had until the next business day to file her EEOC

charge.  *See* Fed. R. Civ. P. 6(a)(1)(C).  Accordingly, dismissal on this

basis is not warranted.

### 3.   *Gunning's EEOC Charge*

The Justice Center argues that Gunning failed to file a properly

verified charge with the EEOC.  (Dkt. No. 46, Attach. 1 at 13-14.)

However, at this juncture because Gunning has alleged that she properly

filed and submitted her EEOC charge, the court will not conduct the

fact-based inquiry necessary to decide this issue.  Although it appears to

lack merit, the Justice Center may renew this argument at the appropriate

time.

### 4.   *Title VII Claims*

Title VII's statute of limitations bars claims based upon events that

occurred more than 300 days prior to filing a charge of discrimination with a

state or local employment agency, and, therefore, "[a] plaintiff may bring a

claim under Title VII only for acts of discrimination that occurred within the

statutory period set by 42 U.S.C. § 2000e–5(e)(1)."  *Patterson v. Cnty. of*

*Oneida*, 375 F.3d 206, 220 (2d Cir. 2004).

"To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period." *Id.* "A claim of hostile work environment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.101, 117 (2002)).

"However, § 2000e-5(e)(1) 'precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period,' even if other acts of discrimination occurred within the statutory time period." *Id.* (quoting *Morgan*, 536 U.S. at 105). "Discrete acts" include acts such as "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114. "Thus, the mere fact that an employee was dismissed within the statutory period cannot be used to pull in a time-barred discriminatory act, for continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Patterson*, 375 F.3d at 220 (internal quotation marks,

alteration, and citations omitted).

　　　　　　*a.*　　*Hostile Work Environment*

　　　　The Justice Center maintains that Gunning's hostile work environment claim is untimely because she does not allege that any acts which would give rise to a hostile work environment occurred within 300 days prior to the filing of her EEOC charge.  (Dkt. No. 46, Attach. 1 at 14.) In response, Gunning asserts that, because she filed her EEOC charge within 300 days of her termination, which was "the final act in a chain of events that collectively created a hostile work environment based on her sex," all preceding related acts that occurred outside the 300-day time period are encompassed by the continuing violation doctrine, and thus not time barred.  (Dkt. No. 47 at 12-13.)  The court agrees with the Justice Center.

　　　　Gunning filed her charge with the EEOC on May 29, 2018. (Compl. ¶ 6; Dkt. No. 46, Attach. 3.)  Thus, only those acts that occurred 300 days before May 29, 2018 are actionable.  *See Patterson*, 375 F.3d at 220.  The only allegation in Gunning's complaint that took place within

12

this 300-day-period is the allegation that, on August 1, 2017,[4] Gunning was told "she had five minutes to resign or she would be fired."  (Compl. ¶ 65.)

"It is well established that termination, whether through discharge or resignation, is a single act, discrete in nature," which does not implicate the continuing violation doctrine.  *See Percy v. New York (Hudson Valley DDSO)*, 264 F. Supp. 3d 574, 582-83 (S.D.N.Y. 2017) (citations omitted) ("[B]ecause Plaintiff's resignation or forced retaliatory termination is a discrete act, it cannot be considered a continuation of the alleged sexual discrimination Plaintiff contends she experienced previously.").  As such, Gunning's termination cannot save her untimely hostile work environment allegations.  *See Brown v. Dep't of Educ. of City of New York*, No. 10 CIV 5023, 2012 WL 1319859, at *4 (S.D.N.Y. Apr. 11, 2012) ("[Plaintiff's] termination . . . is a 'discrete act' of alleged discrimination and therefore unable [to] 'pull in' her earlier hostile work environment allegations." (citation omitted)), *aff'd*, 513 F. App'x. 89, 91 (2d Cir. 2013); *Patterson*, 375 F.3d at 220 ("[T]he mere fact that an employee was dismissed within the statutory period cannot be used to pull in[to the statutory period] a time-

---

[4] As noted above, because the 300th day fell on a national holiday, Gunning's time to file her EEOC charge was extended to the following business day.

barred discriminatory act." (internal quotation marks, alteration, and citation omitted)); *Skates v. Inc. Vill. of Freeport*, 15-CV-1136, 2016 WL 1459659, at *10 (E.D.N.Y. Jan. 28, 2016), *report and recommendation adopted by* 2016 WL 1452391 (E.D.N.Y. Apr. 12, 2016) ("[T]ermination constitutes an unquestionably discrete act with its own filing deadline. . . .  As such, that act cannot be part of a preceding and continuing violation." (internal quotation marks and citation omitted)).

Accordingly, because Gunning fails to allege any act contributing to the allegedly hostile work environment that occurred within 300 days of the filing of her EEOC charge, and because her termination—a separate and discrete act—is unable to "pull in" her earlier hostile work environment allegations, *see Patterson*, 375 F.3d at 220, her hostile work environment claim is untimely, and, thus, dismissed.

        *b.*    *Retaliation*

As to her retaliation claim, the Justice Center argues that such claim must be limited to acts of alleged retaliation that occurred within 300 days of the filing of her EEOC charge.  (Dkt No. 46, Attach. 1 at 15-16.)   In response, Gunning contends that, because her termination occurred within the limitations period, prior related acts of retaliation falling outside of the

300-day-period are not time-barred.

As discussed above, all claims based on acts occurring prior to August 1, 2017, and thus outside the 300-day-period, are time-barred.  *See supra* Part IV.A.4(a).  However, because Gunning alleges that, on August 1, 2017, she was told that "she had five minutes to resign or she would be terminated," so she "involuntarily resigned," (Compl. ¶¶ 65-66), her retaliation claim, based on this event, is timely.  Accordingly, Gunning's retaliation claim is limited to allegations occurring within the 300-day-period.[5]

## B.   **Kiyonaga's Motion**

Gunning claims that Kiyonaga violated the Equal Protection Clause "by subjecting her to sex-based discrimination and retaliation for having complained of sex-based discrimination, culminating in the termination of her employment."  (Compl. ¶ 73.)  Kiyonaga argues that Gunning's claims

---

[5] "[A]lleged incidents that may not be considered for purposes of establishing liability for a hostile work environment, because they occurred outside the limitations period . . . nevertheless may be admissible and probative as background evidence to support a claim based on alleged conduct that falls within the limitations period."  *Percy*, 264 F. Supp. 3d at 584 n.6 (quoting *McGullam v. Cedar Graphics*, 609 F.3d 70, 86 (2d Cir. 2010)).  "As such, discovery is often had into these time-barred events only to the extent that they shed light on events" that are untimely."  *Id.* (internal quotation marks and citation omitted); *see also Reynolds v. Gallagher Bassett Serv., Inc*., No. 5:13-CV-1475, 2014 WL 4771866, at *7 (N.D.N.Y. Sept. 24, 2014) ("Discriminatory conduct [falling outside the 300-day] period may, at this point, be used as evidence to support Plaintiff's claims about the animus that led to her termination.").

should be dismissed for untimeliness, and, any timely asserted claims should be dismissed for failure to state a claim.  (Dkt. No. 44, Attach. 1 at 5-18.)

Employment discrimination claims asserted under § 1983, based on alleged equal protection violations, are generally analyzed under the same standard as Title VII claims when determining whether they state a prima facie case of employment discrimination.  *See Patterson*, 375 F.3d at 225 ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause." (citations omitted)).  However, unlike the 180- or 300-day-period applicable to Title VII claims, the statute of limitations for claims brought pursuant to § 1983 is three years.  *See id.*

### 1.    Hostile Work Environment

A hostile work environment based on sex can support a § 1983 Equal Protection claim.  *See Patterson*, 375 F.3d at 225.  To establish a hostile work environment, "a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create

an abusive working environment." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (internal quotation marks and citation omitted).  The workplace environment must be both objectively "severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* (citations omitted).

Here, Gunning filed her complaint on June 17, 2019.  (Compl.) Accordingly, under the three year statute of limitations, her claims are limited to actions that occurred after June 17, 2016.  *See Patterson*, 375 F.3d at 225.  However, Gunning fails to base her hostile work environment claim on acts or events occurring after June 17, 2016.  Notably, she fails to provide dates for the majority of allegations supporting a hostile work environment claim.  (Compl. ¶¶ 21-29.)  In any event, because Gunning asserts that she complained of Kiyonaga's "abusive" conduct on June 9, 2016, (*id.* ¶ 40), the court has no basis to plausibly infer that any of the preceding events complained of occurred within the applicable statute of limitations.

To the extent Gunning attempts to argue that "Kiyonaga's retaliation against [her] was part and parcel of the sex-based hostile work

environment to which he subjected her," and thus, "given that at least one
retaliatory act occurred within the limitations period (*i.e.*, [Gunning's]
termination) the prior related acts . . . are not time-barred," (Dkt. No. 47
at 13-14), such argument fails.   Although background information before
the applicable statute of limitations period may be used to support
Gunning's claim, *see Morgan*, 536 U.S. at 117 ("Provided that an act
contributing to the [hostile work environment] claim occurs within the filing
period, the entire period of the hostile environment may be considered by a
court for the purposes of determining liability."); *see also Patterson*, 375
F.3d at 225 (recognizing that standards from Title VII are applied in the
Section 1981 and Equal Protection Clause context), "the mere fact that an
employee was dismissed within the statutory period cannot be used to pull
in[to the statutory period] a time-barred discriminatory act," *Patterson*, 375
F.3d at 220 (alteration and internal quotation marks omitted).   Accordingly,
Gunning lacks timely, actionable conduct necessary to maintain a hostile
work environment claim, and thus, the claim is dismissed.

> 2.   *Retaliation*

"As in discrimination claims, the elements of a retaliation claim based
on an equal protection violation under § 1983 mirror those under Title VII."

*Vega v. Hempstead Union Free Sch. Dist*., 801 F.3d 72, 91 (2d Cir. 2015).

To establish a claim of retaliation under Title VII, a plaintiff must allege that

(1) she participated in a protected activity; (2) the employer knew of her

protected activity; (3) she was subjected to an adverse employment action;

and (4) there was a causal connection between the participation in the

protected activity and the adverse employment action.  *See Hicks v.*

*Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

### a.     Protected Activity

Title VII makes it unlawful "for an employer to discriminate against

any of [its] employees . . . because [she] has opposed any practice made

an unlawful employment practice by [Title VII], or because [she] has made

a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under [the statute]."  42 U.S.C.

§ 2000e-3.  "The term 'protected activity' refers to action taken to protest or

oppose statutorily prohibited discrimination."  *Wright v. Monroe Cmty.*

*Hosp*., 493 F. App'x 233, 236 (2d Cir. 2012) (citations omitted).  The scope

of such activity is broad: "When an employee communicates to her

employer a belief that the employer has engaged in . . . a form of

employment discrimination, that communication *virtually always* constitutes

the employee's *opposition* to the activity."  *Littlejohn v. City of New York*,
795 F.3d 297, 317 (2d Cir. 2015) (internal quotation marks, alteration, and
citation omitted).  Protected activity may include both formal and informal
complaints, including complaints to management.  *See id.*  Additionally, a
plaintiff "need not establish that the conduct she opposed was actually a
violation of Title VII, but only that she possessed a good faith, reasonable
belief that the underlying employment practice was unlawful under that
statute."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013)
(citation omitted).

Gunning alleges that, after she "raised concerns" about Kiyonaga's
"apparent sexual relationship" with a female subordinate to both Kiyonaga
and to the Justice Center's then-executive director, Kiyonaga began a
"continuous course of retaliation against her."  (Compl. ¶¶ 30-33.)  In June
2016, she "reported Kiyonaga's retaliatory and abusive conduct" to the
Justice Center's general counsel and its ethics officer.  (Compl. ¶ 40.)  At
this stage, Gunning has sufficiently pleaded that she engaged in a
protected activity when she went to the Justice Center's general counsel

and its ethics officer to complain about Kiyonaga's conduct.[6]  *See Vega*,

801 F.3d at 91 ("Retaliation occurs when an employer takes action against

an employee . . . because [s]he engaged in protected activity—complaining

about or otherwise opposing discrimination."); *LaFontant v. Neale*,

No. 18-CV-23, 2019 WL 1953942, at *7 (S.D.N.Y. May 2, 2019) (holding

that the "[p]laintiff's [oral] complaint to [her supervisor] plausibly constitutes

protected activity of which [the employer] was aware"); *Correa v. Mana*

*Prods., Inc.*, 550 F. Supp. 2d 319, 327 (E.D.N.Y. 2008) (noting that

protected activity includes "informal protests of discriminatory employment

practices, including making complaints to management").

   Accordingly, construing the allegations in the light most favorable to

Gunning, she has adequately pleaded that she participated in protected

activity.

   b. *Adverse Action*

   "[I]n the context of a Title VII retaliation claim, an adverse

employment action is any action that could well dissuade a reasonable

---

[6] To the extent Gunning argues that she was engaging in protected activity when she "raised concerns" about Kiyonaga's "apparent sexual relationship" with a female subordinate, such argument fails.  (Dkt. No. 47 at 15-17.)  The complaint fails to allege sufficient factual allegations from which the court can plausibly infer that she was engaging in protected activity at this time.

worker from making or supporting a charge of discrimination."  *Vega*, 801 F.3d at 90 (internal quotation marks and citation omitted).  Examples of adverse actions "include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Hicks v. Baines*, 593 F.3d 159, 169 (2d Cir. 2010) ("[N]o longer must the alleged retaliatory act bear on the terms or conditions of employment; the proper inquiry now is whether the employer's actions were harmful to the point that they could well dissuade a reasonable worker from [engaging in protected activity]." (citation omitted)).  "Petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks*, 593 F.3d at 165 (citation and internal quotation marks omitted).  The standard for evaluating the materiality of an action alleged to be adverse is objective, but "context matters."  *Id.*  "[A]n act that would be immaterial in some situations is material in others," and some minor acts may be substantial if considered in the aggregate.  *Id.*

22

Following her June 2016 complaint, Kiyonaga "subjected her to a series of adverse actions," including the following: in October 2016, Kiyonaga removed from [Gunning's] jurisdiction her entire [a]udit and [r]eview unit, an essential part of her role as the agency's Inspector General," (Compl. ¶ 54); Kiyonaga "barred [Gunning] from speaking to agencies and groups that had invited her to speak about the Justice Center," even though "she had made such speeches during the entirety of her tenure at the Justice Center," (*id.* ¶ 55); Kiyonaga "repeatedly undermined her authority" and "spoke disparagingly about" her to Miranda, (*id.* ¶ 56); after transferring herself to the agency's Bronx office, Kiyonaga "directed staff not to provide [Gunning] with an office in Albany" and "refused to allow [her] to use her old Albany office when she was there," and, instead, made her sit in a cubicle, (*id.* ¶¶ 60-63); and, "based largely on Kiyonaga's negative feedback about [Gunning], the executive director, Miranda, told Gunning "she had five minutes to resign or she would be fired," (*id.* ¶ 65).

Gunning's allegations are sufficient to meet the adverse action requirement at this stage.  *See Vega*, 801 F.3d at 90 ("Each of these actions *could* well dissuade a reasonable worker from making or supporting

a charge of discrimination." (citation omitted)).  Indeed, viewed in the

context of her other allegations, it is plausible that Kiyonaga was engaging

in a "pattern of discrimination and retaliation designed to make [Gunning]

look bad," and "could very well deter a reasonable worker from

complaining."  *Id.* at 91-92 (citation omitted).  And, although "[s]ome of

these actions, considered individually, might not amount to much," when

"[t]aken together . . . they plausibly paint a mosaic of retaliation and an

intent to punish [Gunning] for complaining of discrimination."  *Id.* at 92; *see*

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir.

2011) ("Alleged acts of retaliation must be evaluated both separately and in

the aggregate, as even trivial acts may take on greater significance when

they are viewed as part of a larger course of conduct." (citation omitted));

*Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 1996) (stating that conduct that

impairs the plaintiff's "reputation, opportunities for advancement and

earning potential" may constitute an adverse employment action);

*Livingston v. Roosevelt Union Free Sch. Dist*., No. 17-CV-4189, 2020 WL

1172642, at *8 (E.D.N.Y. Jan. 15, 2020), *report and recommendation*

*adopted by* 2020 WL 1166450 (E.D.N.Y. Mar. 11, 2020) ("Here, the

Complaint contains multiple plausible allegations of materially adverse

actions that, taken together, might dissuade a reasonable worker from suing her employer for sexual harassment or engaging in other protected activity in the future.  In this regard, some of the conduct at issue that may not constitute material adversity on its own amounts to a plausible pattern of retaliatory conduct when viewed in the aggregate." (citation omitted)).

Accordingly, drawing all inferences in favor of Gunning, she has adequately pleaded an adverse employment action.

> c.    Causation

As for causation, a plaintiff must plausibly plead a connection between the act and her engagement in protected activity.  *See* 42 U.S.C. § 2000e-3(a).  To adequately plead causation, a "plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90 (citation omitted).  "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* (citation omitted).  However, the "but-for causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (internal quotation marks, alterations, and citation omitted).  "Causation may be shown by direct

evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (citation omitted).

"A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." *Vega*, 801 F.3d at 90 (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.") (other citation omitted)).  The Second Circuit has found that as much as a six-month gap between the protected activity and the alleged retaliatory act can support an inference of a causal relationship.  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

Here, Gunning alleges that, after she complained in June 2016 about Kiyonaga's "retaliatory and abusive conduct" to the Justice Center's general counsel and ethics officer, "the retaliation against [her] only intensified." (Compl. ¶¶ 40, 53.)  For instance, within four months, in October 2016, Kiyonaga removed her audit and review unit, "an essential

part of her role as the agency's Inspector General." (*Id.* ¶ 54.)  Thereafter, he "barred [Gunning] from speaking to agencies and groups that had invited her to speak about the Justice Center," (*id.* ¶ 55); "repeatedly undermined her authority" and "spoke disparagingly about" her to Miranda, (*id.* ¶ 56); and, after transferring herself to the agency's Bronx office, Kiyonaga "directed staff not to provide [Gunning] with an office in Albany" and "refused to allow [her] to use her old Albany office when she was there," and, instead, made her sit in a cubicle, (*id.* ¶¶ 60-63).  On August 1, 2017, "based largely on Kiyonaga's negative feedback . . . Miranda told [Gunning] that she had five minutes to resign or she would be fired." (*Id.* ¶ 65.)

Gunning has adequately alleged a causal connection between protected activity and adverse actions.  Indeed, "an inference of causation is more easily drawn when one considers the facts as a whole."  *Duplan*, 888 F.3d at 626.  Further, "[a]t the pleadings stage, causation may be satisfied by allegations that each of the adverse actions defendants took occurred against a backdrop of continuing antagonism and frustration of [the plaintiff's] professional ambitions."  *Collymore v. City of New York*, 767 F. App'x 42, 46 (2d Cir. 2019) (internal quotation marks and citation

omitted).  Here, considering the facts as a whole, and against the "backdrop of continuing antagonism and frustration," Gunning has alleged a "drumbeat of retaliatory animus from which a plausible inference of causation can be drawn."  *See Duplan*, 888 F.3d at 626.  Thus, drawing all inferences in favor of Gunning, she has sufficiently pleaded that she was subjected to a series of adverse actions because she complained about Kiyonaga's conduct.  Accordingly, Kiyonaga's motion to dismiss Gunning's retaliation claim is denied.

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Justice Center's motion to dismiss (Dkt. No. 46) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** as to Gunning's hostile work environment claim, which claim is **DISMISSED**; and

**GRANTED** as to all claims that occurred outside the 300-day-period, which claims are **DISMISSED** as untimely; and

**DENIED** in all other respects; and it is further

**ORDERED** that Kiyonaga's motion to dismiss (Dkt. No. 44) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** as to Gunning's hostile work environment claim, which claim is **DISMISSED**; and

**DENIED** in all other respects; and it is further

**ORDERED** that the following claims remain: a Title VII retaliation claim against the Justice Center, and a retaliation claim pursuant to the Equal Protection Clause against Kiyonaga; and it is further

**ORDERED** that the parties contact Magistrate Judge Christian F. Hummel in order to schedule further proceedings in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 1, 2020
Albany, New York

Gary L. Sharpe
U.S. District Judge

29