**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

PATRICIA GUNNING,

                          Plaintiff,

          v.

NEW YORK STATE JUSTICE CENTER                    No. 1:19-CV-1446
FOR THE PROTECTION OF PEOPLE WITH                (GLS/CFH)
SPECIAL NEEDS, and JAMES KIYONAGA,
sued in his individual capacity,

                          Defendants.

─────────────────────────────

**APPEARANCES:**                        **OF COUNSEL:**

Watkins Law                             CHRISTOPHER D. WATKINS, ESQ.
5 Paradies Lane
New Paltz, New York 12561
Attorney for plaintiff

Bergstein & Ullrich, LLP                STEPHEN BERGSTEIN, ESQ.
5 Paradies Lane
New Paltz, New York 12561
Attorney for plaintiff

Girvin & Ferlazzo, P.C.                 PATRICK J. FITZGERALD, III, ESQ.
20 Corporate Woods Blvd.                SCOTT P. QUESNEL, ESQ.
Albany, New York 12211
Attorneys for defendant New York State
Justice Center for the Protection of People with
Special Needs

O'Connell, Aronowitz Law Firm           MEREDITH H. SAVITT, ESQ.
54 State Street, 9th Floor
Albany, New York 12207
Attorney for defendant Kiyonaga

**MEMORANDUM-DECISION & ORDER**

Presently pending before the Court is plaintiff Patricia Gunning's ("plaintiff")

motion to compel defendants, the New York State Justice Center for the Protection of

People with Special Needs ("Justice Center") and James Kiyonaga ("Kiyonaga")

(collectively, where appropriate, "defendants"), to produce certain documents.  See Dkt.

No. 70-1.  Defendants oppose plaintiff's motion.  See Dkt. Nos. 71, 80.  Plaintiff replies.

See Dkt. No. 86.  For the following reasons, plaintiff's motion to compel is granted in

part and denied in part.

## I.   Background

## A.   Plaintiff's Complaint

For purposes of this motion, the Court will assume the parties' familiarity with the

facts, providing a brief summation of the factual and procedural background.[1]  In 2013,

plaintiff worked as a Special Prosecutor Inspector General at the Justice Center.  See

Dkt. No. 4 ("Compl.") at 3, ¶ 9.  Kiyonaga supervised plaintiff as the Deputy Executive,

and later, Acting Executive Director of the Justice Center.  See id. at 3, ¶ 12.  In June

2019, plaintiff commenced this action alleging sexual discrimination claims against

Kiyonaga, and retaliation claims against Kiyonaga and the Justice Center.  See id. at

12, ¶¶ 72-73.  Defendants moved to dismiss the claims against them.  See Dkt. Nos. 44,

---

[1] A more thorough recitation of plaintiff's factual allegations and procedural history can be found in
plaintiff's complaint and the Court's September 1, 2020, Memorandum-Decision & Order granting in part
and denying in part defendants' motions to dismiss.  See Dkt. Nos. 4, 50.

46.  In September 2020, the Court granted in part and denied in part defendants'
motions, leaving only plaintiff's retaliation claims.  See Dkt. No. 50.

## B.  Plaintiff's Requests

In November 2020, plaintiff submitted to defendants her first requests for the
production of documents.  See Dkt. Nos. 70-5, 70-6.  As relevant here, plaintiff's
requests included:

> 2. Any and all documents which refer or relate to Plaintiff,
> including but not limited to notes, emails, text messages,
> social media postings, or any other electronic
> communications.
>
> 5. Any and all transcripts of any testimony you have given
> related to allegations that you have committed sex-based
> harassment and/or discrimination.[2]
>
> 1. Any and all documents identified in Defendant's Initial
> Disclosures.
>
> 3. Plaintiff's complete payroll records.
>
> 4. Documents reflecting Plaintiff's fringe benefits while she
> was employed by the Justice Center, including documents
> reflecting the monetary value of said benefits.
>
> 5. Any and all documents which refer or relate to the
> decision to terminate Plaintiff's employment unless she
> resigned, including but not limited to, emails, text messages,
> or other electronic communications.
>
> 6. Any and all documents which refer or relate to any
> complaints of sex-based harassment and/or sex-based
> discrimination alleged to have been committed by James
> Kiyonaga, included but not limited to, emails, text messages,
> or other electronic communications.
>
> 7. James Kiyonaga's personnel file, including by not limited
> to, any and all documents which refer or relate to any
> disciplinary action imposed or sought to be imposed on him.

---

[2] Requests two and five were made to defendant Kiyonaga.  All other requests were made to the Justice Center.

8. Any and all documents which refer or relate to any investigation(s) conducted by the Justice Center of complaints of sex-based harassment and/or discrimination alleged to have been committed by James Kiyon[a]ga . . . including but not limited to, emails, text messages, or other electronic communications.

9. Any and all documents provided by the Justice Center to the New York State Office of Inspector General with respect to James Kiyon[a]ga . . . including but not limited to emails, text messages, or other electronic communications.

10. Any and all documents received by the Justice Center from the New York State Office of the Inspector General with respect to James Kiyon[a]ga . . . included but not limited to, emails, texts messages, or other electronic communications.

11. Any and all witness statements which refer or relate to allegations of sex-based harassment and/or discrimination alleged to have been committed by James Kiyon[a]ga[.]

12. Any all communications sent to or received from James Kiyon[a]ga . . . regarding any complaints of sex-based harassment and/or discrimination he allegedly committed, including but not limited to, emails, text messages, or other electronic communications.

13. Any and all documents maintained by, prepared by, or received by Robin Forshaw which refer or relate to allegations of sex-based harassment and/or discrimination by James Kiyon[a]ga . . . , including but not limited to, emails, text messages, or other electronic communications.

14. Any and all documents maintained by, prepared by, or received by Denise Miranda which refer or relate to allegations of sex-based harassment and/or discrimination by James Kiyon[a]ga . . . , including but not limited to, emails, text messages, or other electronic communications.

15. Any and all documents maintained by, prepared by, or received by James Kiyon[a]ga . . . which refer or relate to allegations of sex-based harassment and/or discrimination by James Kiyon[a]ga . . . , including but not limited to, emails, text messages, or other electronic communications.

4

16. Any and all documents maintained by, prepared by, or received by Denise Miranda which refer to relate to Plaintiff allegedly having been insubordinate and/or allegedly having refused to follow agency policies and protocols, including but not limited to, emails, text messages, or other electronic communications.

17. Any and all documents maintained by, prepared by, or received by Robin Forshaw which refer to relate to Plaintiff allegedly having been insubordinate and/or allegedly having refused to follow agency policies and protocols including but not limited to, emails, text messages, or other electronic communications.

18. Any and all documents maintained by, prepared by, or received by James Kiyon[a]ga . . . which refer to relate to Plaintiff allegedly having been insubordinate and/or allegedly having refused to follow agency policies and protocols including but not limited to, emails, text messages, or other electronic communications.

19. Any and all communications between James Kiyonaga and Denise Miranda which refer or relate to Plaintiff, including but not limited to, emails, text messages, or other electronic communications.

20. Any and all communications between James Kiyonaga and Robin Forshaw which refer or relate to Plaintiff, including but not limited to, emails, text messages, or other electronic communications.

21. Any and all communications between Denise Miranda and Robin Forshaw which refer or relate to Plaintiff, including but not limited to, emails, text messages, or other electronic communications.

39. Any and all disciplinary charges proffered against James Kiyonaga.

40. The complete transcripts of any disciplinary hearing of James Kiyonaga.

41. Any audio or video recordings which refer or relate to any of the claims in this case.

Dkt. No. 70-5 at 5-20; Dkt. No. 70-6 at 5-7.  Defendants object to each of the foregoing demands.  See Dkt. Nos. 71, 80.


## II.  Motion to Compel Standard

Under Federal Rule of Civil Procedure 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  FED. R. CIV. P. 26(b)(1).  Rule 26 tasks the Court to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Id.  "A district court has broad latitude to determine the scope of discovery and to manage the discovery process."  EM Ltd. v. Republic of Argentina, 695 F.3d 201, 207 (2d Cir. 2012) (citing In re Agent Orange Prod. Liab. Litig., 517 F.3d 76, 103 (2d Cir. 2008)).  "The party seeking discovery bears the initial burden of proving the discovery is relevant, and then the party withholding discovery on the grounds of burden, expense, privilege, or work product bears the burden of proving the discovery is in fact privileged or work product, unduly burdensome and/or expensive."  Citizens Union of City of New York v. Att'y Gen. of New York, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).

### III.  Arguments

Plaintiff summarizes her motion to compel into five issues: (1) whether the attorney-client privilege applies; (2) whether the Justice Center "should be required to produce basic documents regarding her employment, including those regarding her pay and fringe benefits, or whether plaintiff should be required to try to obtain those documents from other state agencies;" (3) whether "defendants should be required to produce documents related to complaints, and investigations of complaints, that Kiyonaga engaged in sex harassment and sex discrimination while he was a high-ranking official at the Justice Center;" (4) whether the Justice Center should be required to provide "communications, including emails and text messages, between and among Kiyonaga, Robin Forshaw, and Denise Miranda concerning plaintiff;" and (5) whether "defendants should be required to produce documents concerning disciplinary charges and hearing transcripts/documents related to allegations that Kiyonaga engaged in widespread sex harassment and discrimination while he was a high-ranking official at the Justice Center."  Dkt. No. 70-1 at 4-5.

The Justice Center contends that the documents plaintiff seeks are irrelevant to the retaliation claim, not within its possession, overly broad and burdensome, or appropriately withheld under the attorney-client privilege.  See Dkt. No. 80 at 5. Kiyonaga argues that "[t]he central problem with . . . these requests is that they seek documents related to plaintiff's sexual discrimination/hostile work environment claim which was dismissed by the Court and not in any way related to her surviving claim of retaliation."  Dkt. No. 71 at 8.  Kiyonaga contends that the documents are neither relevant to retaliatory intent nor probative of background information.  See id. at 9-11.

## IV.  Discussion

### A.  Attorney-Client Privilege

The Justice Center's updated privilege log to plaintiff indicates that several e-mails are protected under the attorney-client privilege.  See Dkt. No. 86-3.[3]  The Justice Center asserts that "[t]he vast majority of these emails were between attorneys at the Justice Center, the Executive Chamber, and management confidential employees at the Justice Center[]"; therefore, "[a]ny potentially responsive emails that were exchanged for the purpose of providing or receiving legal advice and counseling have been designated as protected from disclosure by the attorney-client privilege[.]"  Dkt. No. 80 at 18-19.  Specifically, the Justice Center contends that the privileged e-mails fall into two categories: "(1) between Attorney [Robin] Forshaw and the Executive Chamber from June 1, 2017 — when written communications were exchanged concerning the removal and replacement of [p]laintiff — and August 1, 2017, when [p]laintiff resigned"; and (2) those "concern[ing] Ms. [Denise] Miranda's communications with the Justice Center's counsel at the Executive Chamber between June 15, 2017 and August 1, 2017, concerning the removal and replacement of [p]laintiff."  Id. at 20-21.  Plaintiff argues that "the Governor's Office does not appear to have been serving as the Justice Center's attorney with respect to plaintiff[']s termination, notwithstanding that some of the recipients/senders at the Governor's Office may have been attorneys (Justice Center's privilege logs do not identify which individuals are attorneys)."  Dkt. No. 86 at 3.

---

[3] In its original privilege log, the Justice Center asserted the deliberative process or executive privilege.  See Dkt. No. 70-8.  In an April 2021 letter to the Court, the Justice Center explained that it "was advised by the Executive Chamber that it does not intend to continue to withhold any documents that were previously withheld on the basis of the deliberative process privilege.  The Justice Center intends to produce all documents that were previously withheld on this basis to Plaintiff's counsel as soon as possible."  Dkt. No. 76 at 1-2.

The Justice Center's privilege log indicates for each e-mail, the date, "type[,]" subject, author, recipient(s), privilege, and "[n]otes[.]"  Dkt. No. 86-3 at 2.  For the privilege section, it states, "ACP[,] and for nearly every e-mail indicating its application, the "[n]otes" section reads, "[c]ommunication exchanged between client (e.g. the Justice Center) and attorney (e.g. Office of the Governor of the State of New York)."  Id. at 2-7.  Some of the e-mails indicate that they are not between attorney and a client but are a "forward[ed] [] communication between" client and attorney.  Id. at 7.  The subject category states things such as, "Counsel Positions[,]" "SPIG[,]" "SPIG/GC candidates[,]" "Special Prosecutor candidates[,]" "Any word on the SPIG situation?" "SPIG-closing the loop[,]" "Fyi[,]" "Confused[.]"  Id. at 2-7.

## 1. Legal Standards

In New York Teamsters Council Prepaid Legal Servs. Plan v. Primo & Centra, this Court explained the attorney-client privilege:

> The attorney-client privilege is a privilege of common law that is to be applied "in light of reason and experience."  United States v. Zolin, 491 U.S. 554, 562 (1989); FED. R. EVID. 501.  The central purpose behind the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  Nonetheless, the privilege is not absolute.  "Since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose."  Fisher v. United States, 425 U.S. 391, 403 (1976).

159 F.R.D. 386, 388 (N.D.N.Y. 1995).

As this Court recently set forth:

> The attorney-client privilege "enable[s] attorneys to give informed legal advice to clients" and "protects communications between a client and its attorney that are intended to be, and in fact were, kept confidential."  Schaeffler v. United States, 806 F.3d 34, 40 (2d Cir. 2015).  This Court has held that communications are deemed confidential if:

> > (1) . . . legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived.
> >
> > Trudeau v. New York State Consumer Protection Bd., 237 F.R.D. 325, 335-36 (N.D.N.Y. 2006) (citing United States v. Int'l Bd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997)) and (In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1036 (2d Cir. 1984)); see also [United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011)].
> >
> > The privilege protects the attorney's advice to the client and the information communicated by the client that provides a basis for giving advice.  See Upjohn Co., 449 U.S. at 390; In re Six Grand Jury Witnesses, 979 F.2d 939, 943-44 (2d Cir. 1992); Chen-Oster v. Goldman, Sachs & Co., 293 F.R.D. 547, 554 (S.D.N.Y. 2013).  "But since the privilege stands in derogation of the public's right to every man's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle."  In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000).
> >
> > The burden of proving the existence of the privilege rests with the party asserting the privilege.  See Mejia, 655 F.3d at 132; In re Grand Jury Subpoena Dated July 6, 2005, 256 F. App'x 379, 382 (2d Cir. 2007) (summary order).  Thus, "[t]he party asserting the privilege must establish the essential elements of the privilege."  United States v. Constr. Prod. Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996) (citations omitted).  "Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege."  Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd 29 F. Supp. 3d 142 (E.D.N.Y. 2014) (citing Scholtisek v. Eldre Corp., 441 F. Supp. 2d 459, 462 (W.D.N.Y. 2006) (additional citations omitted)).

Nat'l Rifle Ass'n of Am. v. Cuomo, 332 F.R.D. 420, 437 (N.D.N.Y. 2019) (spacing added).

As the Justice Center states, "[c]onsultation between a State agency's counsel and the Governor's counsel is a routine fact of the State government structure."  Brown & Williamson Tobacco Corp. v. Pataki, 152 F. Supp. 2d 276, 286 (S.D.N.Y. 2001); see

10

Dkt. No. 80 at 20; see also Koumoulis, 295 F.R.D. at 38 ("It is well-recognized that in-house counsel may serve both legal and business functions, and courts will scrutinize the nature of their communications before finding that those communications are privileged."). However, "[f]undamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct." In re Cnty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007); cf. Lynch v. City of New York, No. 16-CV-7355 (LAP), 2021 WL 5140728, at *6 (S.D.N.Y. Nov. 4, 2021) ("[P]assing remarks made by an officer to a Legal Bureau attorney not designed to seek legal advice are not protected[.]"). "[D]ocuments do not automatically gain the protections of these privileges solely because they were authored by an attorney." Nat'l Rifle Ass'n of Am., 332 F.R.D. at 437 (citing Albany Coll. of Pharmacy & Health Sci. v. Acer, Inc., 1:09-CV-098 (RFT), 2009 WL 10720998, at *2 (N.D.N.Y. Dec. 18, 2009) ("[N]ot all communications with lawyers constitute privileged communications. Only those communications where advice is sought and advice is given is cloaked by the attorney-client privilege.")). Likewise, "[i]nvestigatory reports and materials are not protected by the attorney-client privilege or the work-product doctrine merely because they are provided to, or prepared by, counsel." OneBeacon Ins. Co. v. Forman Int'l, Ltd., No. 04-CV-2271 (RWS), 2006 WL 3771010, at *5-6 (S.D.N.Y. Dec. 15, 2006); see Mac-Ray Corp. v. Ricotta, No. 03-CV-524 (WMS/LGF), 2004 WL 1368857, at *2 (W.D.N.Y. June 16, 2004) (a party's communication "limited to a reiteration of the basic facts of [the] defendant's separation and the submission of his resignation letter" was not a request for legal advice).

A privilege log must "describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without

revealing information itself privileged or protected, will enable other parties to assess the claim." FED. R. CIV. P. 26(b)(5)(A)(ii).  Put another way, "the log must 'provide[] information about the nature of the withheld documents sufficient to enable the receiving party to make an intelligent determination about the validity of the assertion of the privilege.'" Chevron Corp. v. Donziger, No. 11-CV-0691 (LAK/JCF), 2013 WL 4045326, at *2 (S.D.N.Y. Aug. 9, 2013) (quoting Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey, 297 F.R.D. 55, 59 (S.D.N.Y. 2013)).

## 2.  Analysis

The Justice Center's Privilege log does not provide sufficient information as to the subject matter of the e-mails between the Justice Center's management and either the Justice Center's counsel or Executive Chamber, such that the Court can determine whether the attorney-client privilege applies.  See Dkt. No. 86-3; see Koumoulis, 295 F.R.D. at 43 ("There is no dispute concerning whether [the d]efendants had an attorney-client relationship with outside counsel or . . . kept their attorney-client communications confidential.  However, [the] privilege log provides insufficient information as to the third factor required for finding that the attorney-client privilege applies: whether the communications' predominant purpose was to obtain or provide legal advice."); In re Aenergy, S.A., 451 F. Supp. 3d 319, 326 (S.D.N.Y. 2020) (explaining that the privilege log entries are insufficiently descriptive because "the vast majority state only, generically, that the documents are confidential internal documents between GE employees and in-house counsel 'seeking or conveying legal advice' about the 'on-sale contracts,' the 'Credit Facility Agreement,' or 'the AE-GE contracts.'").

12

The Court cannot sufficiently determine whether the e-mails listed in the privilege log concern the seeking or giving of legal advice, or whether they merely reiterate facts related to plaintiff's separation.  See Mac-Ray Corp., 2004 WL 1368857, at *2.  The Justice Center has not identified who on their privilege log are attorneys.  The Justice Center contends that the withheld emails are between some combination of "the Justice Center's counsel at Executive Chamber[,]" Attorney Forshaw, and Ms. Miranda.  Dkt. No. 80 at 21.  After the Justice Center determined it would no longer assert the executive privilege, it produced several e-mails to plaintiff.  See Dkt. No. 86-2.  The Court can glean from these e-mails who appears to be an attorney and who is not; however, the Justice Center should more clearly delineate when an attorney is involved in an e-mail.  See Dkt. Nos. 86-2, 86-3.  Even where, for example, Attorney Robin Forshaw is a part of an e-mail exchange, the attorney-client privilege does not automatically prevent disclosure.  See Nat'l Rifle Ass'n of Am., 332 F.R.D. at 437.  Based on the privilege log is not clear to the Court that an e-mail from Forshaw to Julia Kupiec, who appears to be Assistant Counsel to the Governor, with a subject of "Fyi" seeks or gives legal advice.  Dkt. No. 86-3 at 2; Dkt. No. 86-2 at 65; cf. Pearlstein v. BlackBerry Ltd., No. 13-CV-07060 (CM/KHP), 2019 WL 1259382, at *4 (S.D.N.Y. Mar. 19, 2019)("[I]n light of the two hats often worn by in-house lawyers, communications between a corporation's employees and its in-house counsel though subject to the attorney-client privilege must be scrutinized carefully to determine whether the predominant purpose of the communication was to convey business advice and information or, alternatively, to obtain or provide legal advice.").  As such, the Justice Center must (1) amend its privilege log to include greater specificity while taking care to

not reveal the information contained in the e-mails and produce this to plaintiff; and (2) provide a list of who in the Justice Center and the Executive Counsel are attorneys. The parties must meet and confer to discuss any objections to the updated privilege log, and to the extent any issues cannot be resolved, contact the Court and request that a conference be scheduled.

## B.  Employment Records

As to plaintiff's requests for payroll and "fringe benefits" records, she argues that she should not be required to obtain them from other state agencies, but that the Justice Center is responsible for maintaining or locating the records. Dkt. No 70-1 at 8-9. The Justice Center avers that it "produced all documents currently in its possession that might be responsive to [p]laintiff's request[.]" Dkt. No. 80 at 12. It contends that if another state agency has more information that plaintiff seeks, the Justice Center does not have the authority to compel a separate and distinct agency to produce those documents. See id. at 13. "Nevertheless, the Justice Center [] requested documents from the agencies that would potentially be responsive to [p]laintiff's demands." Id. Michael Donegan, General Counsel for the Justice Center, had "been in contact" with the Office of the New York State Comptroller and the New York State Office of General Services and "asked both agencies to produce any documents in their possession that would be responsive to [p]laintiff's requests." Dkt. No. 80-5 at 2, ¶ 5. The Office of General Services provided Donegan with plaintiff's "Time Sheets[,]" and "[a]lthough [he does] not believe these documents are responsive to [p]laintiff's request or provide any information that is relevant to the proceeding, the Justice Center nevertheless intends to produce these document[s] to [p]laintiff." Id. Donegan also stated that the Justice

Center does not have access to plaintiff's information through the New York State

Employee's Retirement system, but that plaintiff does, and should be able to look there

for more information.  See id. at 2, ¶ 6.  Finally, Donegan explained that "[o]ne of the

documents which may be responsive" to plaintiff's request for documents related to her

"fringe benefits" is the "Management/Confidential [] Handbook published by the

Governor's Office of Employee Relations[.]"  Id. at 3, ¶ 7.  The Justice Center requested

a copy of the handbook that was in effect during plaintiff's employment but, as of the

date of its response to plaintiff's motion, had not received a copy to produce to plaintiff.

See id.

"The burden of establishing control over the documents being sought rests with

the demanding party."  New York ex rel. Boardman v. Nat'l R.R. Passenger Corp., 233

F.R.D. 259, 268 (N.D.N.Y. 2006) (citing DeSmeth v. Samsung Am., Inc., 92-CV-3710,

1998 WL 74297, at *9 (S.D.N.Y. Feb. 20, 1998)).  Insofar as plaintiff contends that the

Justice Center has "the onus for hunting down and retrieving [] records" maintained by

other state agencies, "state agencies for most purposes are separate and distinct and

are not viewed in the aggregate."  New York ex rel. Boardman, 233 F.R.D. at 268

(quoting Strauss v. N.Y.S. Dep't of Ed., 26 A.D.2d 67, 805 N.Y.S.2d 704 (N.Y. App. Div.

Dec. 15, 2005)); Dkt. No. 70-1 at 8-9.  "Generally, a party's good faith averment that the

items sought simply do not exist, or are not in his possession, custody, or control,

should resolve the issue of failure of production since one cannot be required to

produce the impossible."  Mason Tenders Dist. Council of Greater New York v. Phase

Constr. Servs., Inc., 318 F.R.D. 28, 42 (S.D.N.Y. 2016) (citation and quotation marks

omitted).  Plaintiff fails to demonstrate that the Justice Center is in possession, custody, or control of documents from entirely separate state agencies.

Moreover, plaintiff's narrower request, stated in her reply, for "the cost, or value, of her medical, dental, and vision benefits[]" falls under her initial request to the Justice Center for any information related to her "fringe benefits while she was employed by the Justice Center, including documents reflecting the monetary value of said benefits." Dkt. No. 86 at 7; Dkt. No. 70-5 at 6.  The Justice Center provided any documents they had related to plaintiff's initial request, including her complete personnel file.  See Dkt. No. 80 at 12; Dkt. No. 80-5 at 2, ¶ 4; cf. McMillian v. Cnty. of Cortland, No. 9:04-CV-0827 (PAM/GHL), 2008 WL 4283379, at *2 (N.D.N.Y. Sept. 16, 2008) ("The County cannot be compelled to provide information that is not in its possession or control."). Regardless, the Justice Center has contacted other state agencies, sought to obtain a copy of a handbook from the relevant time period containing potentially responsive information, and pointed plaintiff to the New York State Employee's Retirement System which might contain the information she seeks, and to which only she has access.  See Dkt. No. 13-15; Dkt. No. 80-5 at 2-3, ¶¶ 5-7.  Plaintiff has not produced any evidence that the Justice Center has possession of the documents she seeks and the Justice Center's requests to other agencies satisfies any burden it has to engage in discovery. See, e.g., Coan v. Dunne, No. 3:15-CV-00050 (JAM), 2019 WL 276203, at *3 (D. Conn. Jan. 22, 2019).  As such, plaintiff's motion to compel on this ground is denied.

### C. Electronic Communications Concerning Plaintiff

As for plaintiff's request for "[a]ny and all communications" that refer or relate to her and were received or sent by Kiyonaga, Denise Miranda, or Robin Forshaw, the

Justice Center objected to the request as being overly broad, unduly burdensome, and irrelevant.  Dkt. No. 70-5 at 13-14; Dkt. No. 80 at 16.  "During subsequent discussion between counsel, [p]laintiff limited the time period for this request to 2016 and 2017 in an attempt to minimize the burden on the Justice Center."  Dkt. No. 80 at 16.  Plaintiff also suggested that the Justice Center use the search terms, "Gunning," "Patricia," "Trish[,]" and "SPIG[.]"  Id. at 17.  The Justice Center attests that it cannot "search only the body of an email"; therefore, it was only able to perform a search that included "all emails exchanged among these individuals that were sent or received by [p]laintiff."  Id. at 17, n.5; Dkt. No. 80-5 at 3, ¶ 8.  The Justice Center's search revealed 23,922 e-mails from June 8, 2016—the date plaintiff alleged Kiyonaga yelled at her in her office— through August 1, 2017—plaintiff's last day of employment at the Justice Center.  See Dkt. No. 80 at 17.  A search from January 15, 2017—the date Denise Miranda started working at the Justice Center—to August 1, 2017, revealed 9,737 e-mails.  See id.

The Justice Center argues that it "should not be required to disclose thousands of email documents to [p]laintiff which do nothing more than include [p]laintiff's name, or some variation of her name, and title" because "[t]here is no specific basis to believe that the expansive number [of] documents . . . contain any responsive information or information that is relevant to this lawsuit."  Dkt. No. 80 at 17.  Plaintiff argues that she did not request e-mails she sent or received, but "requested emails (and texts) exchanged among Kiyonaga, Forshaw, and Miranda which referenced plaintiff."  Dkt. No. 86 at 6.  She contends that the Justice Center "could relatively easily screen out all e-mails from its search which were sent to or received by plaintiff."  Id.  Plaintiff argues that these e-mails and texts are necessary "to discover highly relevant information,

namely what Kiyonaga was saying about plaintiff to Forshaw and Miranda, and what Forshaw and Miranda were saying about plaintiff to each other and Kiyonaga." Id. at 7. Finally, "[a]s for text messages, [plaintiff contends that] the Justice Center has not provided any explanation as to why it has not produced responsive documents, if any." Id. at 6.

When determining a motion to compel the production of electronically-stored information ("ESI"), "a court normally conducts a two-stage inquiry: whether the party resisting discovery has shown that searching the information in question is not reasonably practicable without undue cost, and whether the party requesting discovery has shown good cause to obtain the information." Sartorius Stedim N. Am. v. Integra Bioprocessing, Inc., No. 19-CV-651 (LDH/VMS), 2020 WL 8261566, at *2 (E.D.N.Y. Sept. 17, 2020) (citing Stinson v. City of New York, No. 10-CV-4228 (RWS), 2015 WL 4610422, at *5 (S.D.N.Y. July 23, 2015)). The Justice Center's initial search, using only four search terms "Gunning," "Patricia," "Trish," and "SPIG," resulted in over 20,000 e-mails. Dkt. No. 80 at 17. The Court agrees that it would be unreasonable for the Justice Center to have to review each e-mail for relevant information. See id. However, because the Justice Center cannot search "only" the body an e-mail, when they searched "Patricia," or variations of plaintiff's name and position, it unsurprisingly revealed every e-mail Patricia Gunning sent or received from 2016 to 2017. Dkt. No. 13 at 17, n.5. By using search terms related to plaintiff's complaints of discrimination and the Justice Center's and Kiyonaga's resulting actions, that do not include plaintiff's name, and limited to only e-mails that were sent or received by Kiyonaga, Miranda, and Forshaw, the results will likely be significantly reduced. The Justice Center contends

that "[p]laintiff was more or less in daily contact with Defendant Kiyonaga, Attorney Forshaw, and/or Ms. Miranda by email" therefore it is not surprising that the search returned upwards of 20,000 e-mails.  Dkt. No. 80 at 17.  Donegan attests that "the search performed by the Justice Center includes e-mails among these individuals that were sent or received by [p]laintiff."  Dkt. No. 80-5 at 4, ¶ 8.  However, as plaintiff contends, excluding e-mails that plaintiff sent or received would likely significantly reduce the number of e-mails produced.  Dkt. No. 86 at 6.  Plaintiff's document requests sought e-mails that not only referred to her, but were "relate[d] to" her.  Dkt. No. 70-5 at 13.

Miranda, Forshaw, and Kiyonaga were allegedly "involved in the decision to terminate" plaintiff's employment, and their communications concerning plaintiff and her complaints and termination[4] are, therefore, relevant.  Dkt. No. 70-1 at 12.  It is possible that there are e-mails concerning the circumstances surrounding plaintiff's complaints and termination that would not explicitly include her name.  "[I]t is critical that the parties work together to define search criteria that will lessen the burdens of electronic discovery."  Stinson, 2015 WL 4610422, at *5.  The parties must meet and confer to create a list of search terms relevant to plaintiff's reports of Kiyonaga's actions and the resulting conduct by Kiyonaga and the Justice Center.  The search should be limited to e-mails sent or received by Kiyonaga, Miranda, and Forshaw.  The relevant time period

---

[4] In plaintiff's complaint, she contends that the Justice Center forced her to "involuntarily resign[]."  Compl. at 11, ¶ 66.  In her motion, she states that she was "terminat[ed.]"  Dkt. No. 70-1 at 3.  For the sake of consistency, the Court will refer to plaintiff's leaving the Justice Center as a termination but the parties should turn over any documents relevant to her employment ending, regardless of whether it was labeled as a resignation or termination.  Cf. McCalla v. SUNY Downstate Med. Ctr., No. 03–CV–2633, 2006 WL 1662635, at *5 (E.D.N.Y. June 8, 2006) (denying motion to dismiss Title VII retaliation claim because the plaintiff sufficiently alleged that he was forced to resign where, among other things, he allegedly was "informed when he arrived at his [disciplinary] hearing regarding allegations of professional misconduct that he would be fired 'no matter what happened.'").

should be limited to emails from sixty days prior to June 9, 2016, through August 1, 2017.[5]  See Stinson, 2015 WL 4610422, at *5 ("The Court therefore directs the parties to meet and confer in order to develop a narrowly tailored search protocol for each custodian or set of custodians whose ESI is to be searched."); William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co., 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("Electronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI.  Moreover, where counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use, and the proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of 'false positives.'").  E-mails that are returned in the search that contain at least one of the search terms, within the relevant time period, and sent or received by the relevant individuals, must be produced to plaintiff.  Should the Justice Center believes any of the resulting e-mails are protected from disclosure, it should submit a privilege log explaining the privilege(s).

Moreover, to the extent that Kiyonaga avers that his producing emails would be duplicative, "[t]he mere existence of overlap and some duplication is insufficient to preclude the discovery sought."  Thomas v. City of New York, 336 F.R.D. 1, 2 (E.D.N.Y. 2020) (citing Kenyon v. Simon & Schuster, Inc., No. 16-MISC-327 (JFK), 2016 WL

---

[5] In the Court's September 1, 2020, Memorandum-Decision & Order, the Court explained that plaintiff's June 9, 2016, complaint to the Justice Center's general counsel and its ethics officer was her earliest exercise of protected activity.  See Dkt. No. 50 at 20-21; Compl. at 7, ¶ 40.  However, because proving a prima facie case of retaliation requires, in part, a showing that the employee's complaint was based on "a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII[,]" conduct prior to her June 9, 2016, complaint is relevant.  Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir.2013) (quotation omitted).  Accordingly, any communications produced by defendants must date back to at least sixty days prior to June 9, 2016.

5930265, at *6 (S.D.N.Y. Oct. 11, 2016) ("The Court is not persuaded that simply

because a subset of documents—i.e., communications with Clare—may also be

available from Clare, [the plaintiff's] requests are unreasonably duplicative or

cumulative. . . .  Rule 26(b)(2)(C)(i) does not require requests to be circumscribed pens

sharing no common ground.  It requires only that the overlap not be 'unreasonable.'"));

see Dkt. No. 71 at 7.  Kiyonaga's search of his communications would result in

documents concerning plaintiff and could potentially yield smaller or different results

than what the Justice Center's search returns.  "Furthermore, even if duplicative,

obtaining the information about custodian of a text message or email yields pertinent

information" because "even if an email was produced from one witness's custodial

inbox, producing the same email from another witness's inbox establishes that the

second witness received the email (and helps counter any suggestion that he or she

lacked knowledge of or did not receive the email in question)."  Thomas, 336 F.R.D. at

2.  This is relevant as the crux of plaintiff's allegations is what information Kiyonaga,

Forshaw, and Miranda knew regarding plaintiff's protected activity and whether that

resulted in any adverse actions against her.  See Compl. at 6, ¶ 33; Dkt. No. 86 at 7.

Therefore, Kiyonaga should turn over to plaintiff any e-mails he sent to, or received

from, Miranda and Forshaw related to plaintiff, her complaints against him, and her

termination, beginning sixty days prior to June 9, 2016, through August 1, 2017.

To the extent plaintiff requested text messages between Kiyonaga, Miranda, and

Forshaw, defendants do not explain whether they exist or why they have not been

produced, and do not otherwise argue that they are being appropriately withheld.  See

Dkt. No. 86 at 6.  Rather, defendants objected to the request as overly broad and

21

vague.  See Dkt. No. 70-5 at 13-14; Dkt. No. 70-6 at 5-6.  Plaintiff argues that these communications are relevant to establish the reasons for the Justice Center's and Kiyonaga's actions.  See Dkt. No. 70-1 at 11-12.  The Court agrees that such communications are relevant to plaintiff's retaliation claim, and her motion to compel text messages between the parties as they relate to her is granted.  See Thomas, 336 F.R.D. at 5 ("If the contention is the chats were not preserved and there is nothing to review, then [the d]efendants should provide a statement to that effect."); see also Burns v. Imagine Films Ent., Inc., 164 F.R.D. 589, 593 (W.D.N.Y. 1996) (explaining that objections claiming a request is vague of unduly burdensome is "not sufficiently specific to allow the court to ascertain the claimed objectionable character of the Discovery Request, further, this type of general objection is not proper.").  The parties should produce to plaintiff any text messages sent or received by Kiyonaga, Miranda, or Forshaw, from at least sixty days prior to June 9, 2016, through August 1, 2017, concerning plaintiff's complaints of sexual discrimination, and her termination.

### D.  Documents Concerning "Other" Sexual Harassment Complaints

Plaintiff's document requests numbers 6-15 and 39-41 to the Justice Center, and number 5 to Kiyonaga, seek information related to "[a]ny and all" complaints, investigations, and disciplinary charges related to "sex-based harassment and/or sex-based discrimination alleged to have been committed by" Kiyonaga.  Dkt. No. 70-5 at 7-11, 19-20; Dkt. No. 70-6 at 7.  Plaintiff contends that these requests are relevant to her retaliation claim because "[t]he extent of Kiyonaga's harassing and discriminatory conduct, complaints about that conduct, and investigations about that conduct, are all directly relevant to the retaliatory animus directed at plaintiff for having complained

about Kiyonaga's harassing and discriminatory conduct."  Dkt. No. 70-1 at 10.

Specifically, plaintiff avers that she is "entitled to evidence showing that Kiyonaga's

sexist and discriminatory conduct was open and notorious within the agency, which

made her allegations against him particularly dangerous when it came to protecting

Kiyonaga, and by extension the agency."  Dkt. No. 86 at 5.

Kiyonaga argues that the information related to any alleged sexual harassment

or discrimination is not relevant to retaliatory intent or probative for background

information.  See Dkt. No. 71 at 8-11.  Kiyonaga contends that his New York State Civil

Service § 75 hearing and charges were not related to plaintiff; the New York State

Inspector General investigation took place after plaintiff resigned; and that her retaliation

claim relates back only to the time of protected activities, "not any alleged harassment

that preceded it."  Id. at 8.  The Justice Center similarly argues that the information

plaintiff seeks is not relevant to her retaliation claim because "[e]vidence to support [her]

claims cannot be derived from documents regarding other allegations of sex-based

discrimination and/or harassment made against [] Kiyonaga that were alleged to have

occurred while [she] was employed by the Justice Center, but which [she] did not know

about while she was employed . . . [.]"  Dkt. No. 80 at 8.  The Justice Center contends

that plaintiff admitted in her complaint that she had limited knowledge regarding other

allegations against Kiyonaga at the time of her protected activity—when she "raised

concerns" to Jeffrey Wise, Forshaw, and Miranda—and that it was only after she

resigned and through the New York State Inspector General's 2018 report that she

learned of the other allegations.  Id. at 7-9; see also Compl. at 3, ¶ 13 ("Unknown to

[p]laintiff at the time, Kiyonaga had a long history of engaging in sexual harassment and

discriminatory treatment . . . .").  In reply, plaintiff relies heavily on the weight this information could have on Kiyonaga's credibility, stating that "Kiyonaga will assert that he did not engage in sex harassment and that plaintiff's complaints against him were baseless" and that "parties are often required to produce transcripts of their testimony in other, wholly unrelated, cases, as testimony under oath always bears on a party's credibility." Dkt. No. 86 at 6, n.3.  Plaintiff also contends that the information is relevant to establish that she had a good faith belief that "her complaints against Kiyonaga were protected from retaliation by Title VII." Dkt. No. 70-1 at 11.

"Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir.2005); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  "First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (citations and quotation marks omitted).  If the plaintiff sustains this burden, "a presumption of retaliation arises." Jute, 420 F.3d at 173.  The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." Id. If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." Id.  Relevant here, "protected activities are not limited to complaints involving discrimination against the complainant herself, but also extend to complaints of discrimination on behalf of

other employees and complaints of discriminatory practices generally[.]" Littlejohn v. City of New York, 795 F.3d 297, 317 (2d Cir. 2015).

To support her argument, plaintiff points to the Court's September 1, 2020, Memorandum-Decision & Order dismissing plaintiff's hostile-work environment claims but permitting her retaliation claim to proceed. See Dkt. No. 70-1 at 9-10 (citing Dkt. No. 50 at 15). In a footnote, the Court stated,

> "[A]lleged incidents that may not be considered for purposes of establishing liability for a hostile work environment, because they occurred outside the limitations period . . . nevertheless may be admissible and probative as background evidence to support a claim based on alleged conduct that falls within the limitations period." Percy [v. New York (Hudson Valley DDSO), 264 F. Supp. 3d 574, 584, n.6 (S.D.N.Y. 2017)] (quoting McGullam v. Cedar Graphics, 609 F.3d 70, 86 (2d Cir. 2010)). "As such, discovery is often had into these time-barred events only to the extent that they shed light on events[] that are untimely." Id. (internal quotation marks and citation omitted); see also Reynolds v. Gallagher Bassett Serv., Inc., No. 5:13-CV-1475, 2014 WL 4771866, at *7 (N.D.N.Y. Sept. 24, 2014) ("Discriminatory conduct [falling outside the 300-day] period may, at this point, be used as evidence to support Plaintiff's claims about the animus that led to her termination.").

Dkt. No. 50 at 15, n.5. This footnote, read in context, explains that although the Court limited plaintiff's retaliation claim "to allegations occurring within the 300-day-period[,]" allegations outside of that time frame may be considered if they "shed light" on the timely claim. Id. at 15. To the extent Kiyonaga argues that plaintiff's "retaliation claims begin at the point of the engagement in the protected activity – essentially the acts of complaint – not any alleged harassment that proceeded it[,]" the Court's footnote explains why such information may still be relevant to her claim. Dkt. No. 71 at 8; Dkt. No. 50 at 15, n.5. If plaintiff were aware of harassing conduct committed against other Justice Center employees occurring prior to August 1, 2017, and she reported this conduct as part of her protected activity, information concerning that other conduct is

25

discoverable.  See Reynolds, 2014 WL 4771866, at *7 (citation and quotation marks omitted) ("Courts have found that the purpose of admitting evidence of violations outside the limitations period may be considered to assess liability on the timely alleged act.").

In her complaint, plaintiff alleges that "Kiyonaga regularly subjected [her] to unwanted and offensive sexualized comments."  Compl. at 5, ¶ 21.  Plaintiff attests that "[o]n or about July 2015, [she] raised concerns with Kiyonaga about his apparent sexual relationship" with a subordinate.  Id. at 6, ¶ 30.  "Plaintiff also raised her concerns about Kiyonaga's sexual relationship with a female subordinate . . . to the agency's then-Executive Director, Jeff Wise."  Id. at 6, ¶ 31.  Following plaintiff's conversation with Kiyonaga concerning only his alleged relationship with a subordinate, he allegedly proceeded to perform retaliatory acts such as screaming at plaintiff, blocking her from obtaining a raise, and excluding her from meetings.  See id. at 6-7, ¶¶ 33-38.  "On June 9, 2016, [p]laintiff reported Kiyonaga's retaliatory and abusive conduct" to Forshaw.  Id. at 7, ¶ 40.  Additionally, "[o]n June 13, 2016, [p]laintiff complained about Kiyonaga's abusive and deeply disturbing conduct . . . and expressly stated her belief that Kiyonaga was retaliating against her for having raised concerns about his inappropriate quid pro quo sexual relationship with a female subordinate, and his sexualization of the office work environment."  Id. at 7, ¶ 41.  Plaintiff then complained to the Justice Center's affirmative action officer "in which she opposed Kiyonaga's quid pro quo sex-based arrangement . . ., the creation of a hostile work environment based on sex created by Kiyonaga, and retaliation by Kiyonaga[.]"  Id. at 8-9, ¶ 48.  As a result, plaintiff brought the present action, complaining of "the retaliation to which Kiyonaga subjected [p]laintiff,

as well as retaliation by the Justice Center for complaining about unlawful sex-based discrimination, including an apparent quid pro quo sexual relationship between Kiyonaga and a subordinate female employee[.]"  Id. at 11, ¶ 69.

Plaintiff avers that "five other female Justice Center employees recounted sexual harassment and acts of sex-based discrimination perpetrated by Kiyonaga" and refers to three of them as, "Witness 1," "Witness 2," and "Witness 3."  Compl. at 4-5, ¶ 20. Plaintiff also states, "[t]wo other women reported that Kiyonaga regularly made inappropriate comments[.]"  Id. at 5, ¶ 20.  Plaintiff contends that "Forshaw was Counsel to the Governor . . . in 2012 when Kiyonaga was the subject of a complaint by several female subordinates that he had created a hostile work environment[.]"  Id. at 8, ¶ 42. However, plaintiff does not explain where or when she learned of this information, or whether she included these allegations or reports in her complaints to Forshaw or the Justice Center's affirmative action officer.  In her complaint she states that "[u]nknown to [p]laintiff at the time, Kiyonaga had a long history of engaging in sexual harassment and discriminatory treatment of women while he was employed by various New York State agencies."  Id. at 3, ¶ 13.  Plaintiff relies on "a May 30, 2018[,] report by the New York State Inspector General" which indicated that "[a]fter several female employees complained about" Kiyonaga's conduct, he received a counseling memorandum about the behavior.  Id. at 4, ¶ 17.  Attached to her motion to compel, the 2018 report identifies five women who complained of sexual harassment, and labels them as "Witness" one through five.  Dkt. No. 70-4 at 3-4.  The report details their allegations in a nearly identical way to what plaintiff attests in her complaint.  Compare id., with Compl. at 4-5, ¶ 20.  Plaintiff left the Justice Center in August 2017.  See Compl. at 11, ¶ 65.

27

Plaintiff does not provide detailed information about what she reported to the Justice Center in terms of Kiyonaga's alleged sexual harassment and discrimination aside from his relationship with a subordinate.  See Compl. at 6, ¶ 31; 7, ¶¶ 40-41.  As defendants argue, it appears that plaintiff did not have information about "other" allegations against Kiyonaga until the release of the 2018 report.  Dkt. No. 80 at 8; Dkt. No. 71 at 9-11.  Plaintiff is entitled to information regarding the context, substance, and response to her complaints, even if those complaints included information about other employees.  See Littlejohn, 795 F.3d at 317.  However, any information relating to other allegations that plaintiff did not learn of until after her termination is not relevant to plaintiff's protected activity or whether defendants retaliated against her.  Cf. Brown v. Xerox Corp., 170 F. Supp. 3d 518, 527 (W.D.N.Y. 2016) ("There is nothing in the record suggesting that [the p]laintiff complained that any of these employees' Title VII rights had been violated or that they had been discriminated against.").

Plaintiff specifically seeks transcripts from Kiyonaga's § 75 hearing which occurred after Kiyonaga was no longer employed at the Justice Center.  See Dkt. No. 70-1 at 12; Dkt. No. 71 at 6.  This hearing did not concern plaintiff and occurred after her termination.  See Dkt. No. 71 at 6, 9; Dkt. No. 71-1 at 2.  Therefore, the Court does not see its relevance to plaintiff's protected activity or the alleged, resulting retaliation.  Plaintiff has failed to demonstrate that she was aware of these other incidents at the time she complained "to the Justice Center's general counsel or its ethics officer[.]"  Dkt. No. 50 at 20-21; see Compl. at 7, ¶¶ 40-41; 8, ¶ 48.  Accordingly, her motion to compel seeking documents related to other complaints or investigations against Kiyonaga is denied.

Plaintiff also argues that information related to the other allegations against Kiyonaga is relevant to Kiyonaga's, Miranda's, Forshaw's, "and other Justice Center employees[']" credibility.  Dkt. No. 70-1 at 11.  Discovery is allowed on "any nonprivileged matter that is relevant to any party's claim or defense."  FED. R. CIV. P. 26(b)(1).  "Relevance" "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case."  Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978).  "Accordingly, '[d]iscovery is commonly allowed in which the discovering party seeks information with which to impeach witnesses for the opposition. . . .  Information showing that a person having knowledge of discoverable facts may not be worthy of belief is always relevant to the subject matter of the action.'"  Knapik v. Mary Hitchcock Mem'l Hosp., No. 5:12-CV-175, 2014 WL 12717392, at *9 (D. Vt. May 27, 2014) (alteration in original) (quoting 8 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2015 (3d ed. 2013)) (citing Duggan v. Vill. of New Albany, No. 2:08-CV-814, 2009 WL 650461, at *3 (S.D. Ohio Mar. 11, 2009) (holding that "the credibility of witnesses is an issue in every case[,]" and, therefore, "a party might be entitled to discover evidence of prior workplace discipline if, as part of the disciplinary incident, a witness acted in a dishonest manner or made an untruthful statement"); and Cabana v. Forcier, 200 F.R.D. 9, 17 (D. Mass. 2001) ("Inquiries concerning a witness['s] credibility are relevant and thus reasonably calculated to lead to the discovery of admissible evidence, even if the information sought is not directly related to the subject of the underlying litigation.")).

Plaintiff contends that information related to other complaints against Kiyonaga is relevant because "Kiyonaga will assert that he did not engage in sex harassment and that plaintiff's complaints against him were baseless." Dkt. No. 86 at 6.  For a retaliation claim, the relevant inquiry is whether the plaintiff complained of conduct she believed to be discriminatory and adverse employment actions were taken against the plaintiff as a result—not whether the conduct is determined to be legally harassing or discriminatory. See La Grande v. DeCrescente Distrib. Co., 370 F. App'x. 206, 212 (2d Cir. 2010) (summary order) (citation and quotation marks omitted) ("It is well-established that a plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law."); Wimmer v. Suffolk Cnty. Police Dep't., 176 F.3d 125, 135 (2d Cir. 1999) ("We have previously applied this rule to find that a plaintiff may state a prima facie case for retaliation even when her primary claim for discrimination is insufficient to survive summary judgment.).  Plaintiff is correct that she must show that she had a good faith belief that her complaints were protected from retaliation under Title VII.  See Dkt. No. 70-1 at 11.[6]  However, this does not require a showing that Kiyonaga's conduct was legally discriminatory.  See La Grande, 370 F. App'x. at  212.  Therefore, although Kiyonaga's denial of any misconduct could be relevant to his credibility in a discrimination or harassment claim, his denial is not relevant to plaintiff's retaliation claim, which addresses whether he, or the Justice Center, took adverse actions against

---

[6] The Justice Center contends that it "does not intend to argue that it took any employment actions against [p]laintiff because she made a bad faith complaint[.]"  Dkt. No. 80 at 11.  Kiyonaga similarly explains that he has "not raised whether raised plaintiff asserted her alleged complaint in good faith."  Dkt. No. 71 at 11.

plaintiff for complaining about his alleged misconduct, which she believed was

harassing.  Cf.  Alvarado v. GC Dealer Servs. Inc., No. 18-CV-2915 (SJF/SIL), 2018 WL

6322188, at *4 (E.D.N.Y. Dec. 3, 2018).[7]

To be sure, "[e]vidence of company-wide patterns of discrimination may reveal

discrimination against a particular group of employees and thus be relevant."  Chen-

Oster v. Goldman, Sachs & Co., 293 F.R.D. 557, 567 (S.D.N.Y. 2013) (citation and

quotation marks omitted).  "Broader discovery is warranted when a plaintiff's claims are

premised on a pattern or practice of discrimination at the organization-wide level, as

opposed to specific allegations of discrimination made against an individual supervisor."

Id. at 562; compare Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City

of New York, No. 18-CV-4476 (LJL/SLC), 2020 WL 1166047, at *4 (S.D.N.Y. Mar. 11,

2020) (allowing discovery of both "substantiated" and "unsubstantiated" complaints

during the relevant time period for a disparate treatment and disparate impact case),

with Babbitt v. Koeppel Nissan, Inc., No. 18-CV-5242 (NGG/CLP), 2019 WL 3296984,

at *4 (E.D.N.Y. July 23, 2019) (explaining that in a discrimination and retaliation case,

discovery requests asking for "any complaints" of discrimination and harassment made

against defendants or "any of their employees[,]" should be limited "to any and all

complaints of gender discrimination, sexual harassment, and retaliation by employees in

plaintiff's employment department or unit.").  Here, whether there was a pattern or

practice of discrimination at the Justice Center or perpetrated by Kiyonaga is not at

---

[7] "[The d]efendants' motion seeks to support an argument that [the p]laintiff told the same lie twice—once to whatever agency he allegedly sought benefits from, and then again in bringing these proceedings—by misrepresenting his actual pay, in order to obtain more money.  [The d]efendant does not claim however that [the plaintiff] was actually ever paid any such benefits in the other proceeding, and that question is not before this Court.  Accordingly, the discovery sought would be of limited value, essentially creating a trial within a trial concerning whether any other benefits were properly awarded to [the plaintiff], and under these circumstances is disproportionate to the needs to this case."

issue.  See Dkt. No. 50.  Rather, the only issue is whether Kiyonaga or the Justice

Center took adverse actions against plaintiff.  As only plaintiff's retaliation claims

remain, discovery related to other allegations or complaints against Kiyonaga is not

relevant.  Accordingly, plaintiff's motion to compel insofar as is seeks information about

other complaints against Kiyonaga is denied.  Plaintiff's motion to compel is granted as

it relates to any complaints and investigations against Kiyonaga initiated by plaintiff's

protected activity.

### E. Kiyonaga's Personnel File

Plaintiff seeks "relevant portions of Kiyonaga's personnel file."  Dkt. No. 70-1 at 9;

Dkt. No. 70-5 at 8.  "[E]mployer[]s [have an] interest in maintaining the confidentiality of

employee personnel files."  Duck v. Port Jefferson Sch. Dist., No. 07-CV-2224

(ADS/WDW), 2008 WL 2079916, at *4 (E.D.N.Y. May 14, 2008).  "However, there is no

rigid rule prohibiting discovery of employee personnel files."  Id.; see also E.E.O.C. v.

Beauty Enterprises, Inc., No. 3:01-CV-378 (AHN), 2008 WL 3359252, at *6 (D. Conn.

Aug. 8, 2008) ("While personnel files should not be produced normally in discovery, they

are highly relevant to a plaintiff's claims in an employment discrimination case.").

"Evidence relating to company-wide practices may reveal patterns of discrimination

against a group of employees, increasing the likelihood that an employer's offered

explanation for an employment decision regarding a particular individual masks a

discriminatory motive."  Hollander v. Am. Cyanamid Co., 895 F.2d 80, 84 (2d Cir. 1990).

"This same evidence may be used to detect retaliatory motives . . . ."  Moll v. Telesector

Res. Grp., Inc., 760 F.3d 198, 204 (2d Cir. 2014) (vacating a district court order denying

a plaintiff's motion to compel because the denial "deprived [the plaintiff] of the

opportunity to find evidence that might support her argument that [the defendant's] reasons for firing her were pretextual[.]").  "[D]iscovery of a personnel file is appropriate where the individual is alleged to have engaged in the discrimination or retaliation at issue, or played a significant role in the decision or incident that gives rise to the lawsuit."  Dzanis v. JPMorgan Chase & Co., No. 10-CV-3384 (BSJ/JLC), 2011 WL 5979650, at *4 (S.D.N.Y. Nov. 30, 2011); see also Diaz v. Loc. 338 of the Retail, No. 13-CV-7187 (SJF/SIL), 2014 WL 12778840, at *3 (E.D.N.Y. Aug. 21, 2014), objections overruled, 2014 WL 4384712 (E.D.N.Y. Sept. 3, 2014) (ordering production of the personnel files of "four individuals whom [the plaintiff] claims were directly involved in the decision to fire him.").  Plaintiff contends that Kiyonaga was "involved in the decision to terminate" her employment, which defendants do not dispute. Dkt. No. 70-1 at 11-12; see Dkt. Nos. 71, 80.  Plaintiff is therefore entitled to relevant portions of Kiyonaga's personnel file which could reveal information related to plaintiff's complaints against him or why plaintiff "involuntary resigned."  Compl. at 11, ¶ 66.  Accordingly, plaintiff's motion to compel as it relates to Kiyonaga's personnel file is granted.  Given the sensitive nature of personnel files, the Justice Center shall produce the entire file to the Court for it to conduct an in camera review within 10 days of this Memorandum-Decision & Order. Following review, the Court will issue an Order reflecting what portions of the file must be produced to plaintiff.

## F. Audio and Video Recordings

Plaintiff requests "[a]ny audio or video recordings which refer or relate to any of the claims in this case."  Dkt. No. 70-5 at 20.  Defendants objected to this request as overbroadly broad, vague, ambiguous, unduly burdensome, and not reasonably

calculated to lead to the discovery of admissible evidence.  See Dkt. No. 70-5 at 20; Dkt. No. 70-6 at 6.  Plaintiff contends that "any recordings, are relevant for purposes of discovery and should be produced largely for the same reasons" as she gives for seeking to compel documents related to other allegations and complaints against Kiyonaga.  Dkt. No. 70-1 at 12; 9-11.  Plaintiff alleges that "Kiyonaga led a highly visible campaign of retaliation against her[.]"  Id. at 10.

        "[T]he objecting party bears the burden of demonstrating specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys., 272 F.R.D. 315, 316 (D. Conn. 2011) (citations and quotation marks omitted); Jackson v. Edwards, No. 99-CV-0982 (JSR/HBP), 2000 WL 782947, at *3 (S.D.N.Y. June 16, 2000) ("[C]onclusory assertion[s] of burdensomeness [are] entitled to no weight whatsoever.").  Plaintiff alleges that Kiyonaga often yelled at her in person and over the phone, kept her from meetings, and "slam[ed] her office door."  Compl. at 6-7, ¶¶ 34-38.  The Court is not aware of whether the Justice Center maintains cameras in their offices, records phone conversations, or whether defendants otherwise have audio or video recordings relevant to this action.  However, as defendants bear the burden of proving why plaintiff's request is overly burdensome or vague, and they have failed to provide an explanation, or indicate that they do not possess such evidence, plaintiff's motion to compel on this ground is granted.  See Am. Rock Salt Co., LLC v. Norfolk S. Corp., 228 F.R.D. 426, 439 (W.D.N.Y. 2004) ("Defendants asserted generalized objections. . . .

Defendants' [] objections to this request are overruled as without basis.").  Accordingly, defendants should produce any audio or video recordings in its possession that were taken from at least sixty days prior to June 9, 2016, through August 1, 2017.

## V. Conclusion

Wherefore, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's Motion to Compel, Dkt. No. 70-1, is **GRANTED IN PART**:

Within **10 days** from the filing date of this Memorandum-Decision & Order, the Justice Center shall submit Kiyonaga's personnel file to the Court for it to conduct an in camera review.  The Court will then issue an Order instructing the Justice Center of what portions of the file must be produced to plaintiff.

Within **45 days** from the filing date of this Memorandum-Decision & Order, defendants are to (1) produce to plaintiff an updated privilege log as to the e-mails claimed to be protected under the attorney-client privilege; (2) meet and confer to discuss the updated privilege log as well as develop new search terms relevant to plaintiff's complaints of harassing conduct and her termination, conduct a search of Kiyonaga's, Forshaw's, and Miranda's e-mails, and produce to plaintiff any responsive e-mails containing at least one search term; and (3) produce to plaintiff all documents responsive to the following demands:

> 2. Any and all documents which refer or relate to Plaintiff, including but not limited to notes, emails, text messages, social media postings, or any other electronic

communications, beginning at least sixty days prior to June 9, 2016, through August 1, 2017.[8]

5. Any and all documents which refer or relate to the decision to terminate Plaintiff's employment unless she resigned, including but not limited to, emails, text messages, or other electronic communications that were sent by Kiyonaga, or received from Miranda or Forshaw between sixty days prior to June 9, 2016, through August 1, 2017.

6. Any and all documents which refer or relate to any complaints of sex-based harassment and/or sex-based discrimination alleged to have been committed by James Kiyonaga, including but not limited to, emails, text messages, or other electronic communications, as far as the complaints were made my plaintiff.

8. Any and all documents which refer or relate to any investigation(s) conducted by the Justice Center of complaints of sex-based harassment and/or discrimination alleged to have been committed by James Kiyonaga including but not limited to, emails, text messages, or other electronic communications, as far as the investigations relate to plaintiff's complaints.

19. Any and all communications between James Kiyonaga and Denise Miranda which refer or relate to Plaintiff, including but not limited to, emails, text messages, or other electronic communications that were sent or received sixty days prior to June 9, 2016, through August 1, 2017.  The emails should contain at least one relevant search term.

20. Any and all communications between James Kiyonaga and Robin Forshaw which refer or relate to Plaintiff, including but not limited to, emails, text messages, or other electronic communications that were sent or received sixty days prior to June 9, 2016, through August 1, 2017.  The emails should contain at least one relevant search term.

21. Any and all communications between Denise Miranda and Robin Forshaw which refer or relate to Plaintiff, including but not limited to, emails, text messages, or other electronic communications that were sent or received sixty days prior

---

[8] This request seeks documents from defendant Kiyonaga.  All other requests are related to the Justice Center.

to June 9, 2016, through August 1, 2017.  The emails should contain at least one relevant search term.

41. Any audio or video recordings which refer or relate to any of the claims in this case that were taken sixty days prior to June 9, 2016, through August 1, 2017.

**ORDERED**, that plaintiff's Motion to Compel, Dkt. No. 70-1, is otherwise

**DENIED**.

**IT IS SO ORDERED**.

Dated: March 15, 2022
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge