**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**PATRICIA GUNNING,**

**Plaintiff,**

      **v.**

**NEW YORK STATE JUSTICE**
**CENTER FOR THE PROTECTION**
**OF PEOPLE WITH SPECIAL**
**NEEDS et al.,**

**Defendants.**

_____

**1:19-cv-1446**
**(GLS/CFH)**

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Watkins Law | CHRISTOPHER D. WATKINS, |
| 5 Paradies Lane | ESQ. |
| New Paltz, NY 12561 | |
| | |
| Bergstein & Ullrich, LLP | STEPHEN BERGSTEIN, ESQ. |
| 5 Paradies Lane | |
| New Paltz, NY 12561 | |
| | |
| **FOR THE DEFENDANTS:** | |
| _New York State Justice Center_ | |
| _for the Protection of People_ | |
| _With Special Needs_ | |
| Girvin & Ferlazzo, P.C. | PATRICK J. FITZGERALD, III |
| 20 Corporate Woods Boulevard | ESQ. |
| Albany, NY 12211-2350 | SCOTT P. QUESNEL, ESQ. |
| | |
| _James Kiyonaga_ | |
| O'Connell & Aronowitz, P.C. | GRAIG F. ZAPPIA, ESQ. |
| 54 State Street - 9th Floor | |

Albany, NY 12207

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Patricia Gunning commenced this action against defendants New York State Justice Center for the Protection of People With Special Needs (hereinafter "the Justice Center") and James Kiyonaga pursuant to Title VII[1] and 42 U.S.C. § 1983.  (Compl., Dkt. No. 4.)  On September 1, 2020, the court granted in part and denied in part the Justice Center's and Kiyonaga's respective motions to dismiss.  (Dkt. No. 50.)  The surviving claims are a Title VII retaliation claim against the Justice Center, and a retaliation claim pursuant to the Equal Protection Clause against Kiyonaga. (*Id.*)  Pending are defendants' motions for summary judgment.  (Dkt. Nos. 108, 110.)  For the reasons that follow, the motions are denied.

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

2

## II.  **Background**

### A.    **Facts**[2]

In June 2013, Gunning was appointed to the position of Special Prosecutor/Inspector General (SPIG) at the Justice Center.  (Kiyonaga's Statement of Material Facts (SMF) ¶ 1, Dkt No. 108, Attach. 23.)  Kiyonaga was Gunning's direct supervisor.  (*Id.* ¶ 3.)  On June 8, 2016, Kiyonaga went to Gunning's office to discuss a work-related matter.  (*Id.* ¶ 4; Justice Center's SMF ¶ 30, Dkt. No. 110, Attach. 2.)  While in Gunning's office, Kiyonaga became "frustrat[ed]," yelled, and used profanity.  (Justice Center's SMF ¶ 34.)  Gunning reported the incident in her office, via email, to Robin Forshaw, the Justice Center's general counsel, and David

---

[2]   Unless otherwise noted, the facts are not in dispute.  The Justice Center, in addition to individual denials to Gunning's statement of material facts, objects to Gunning's statement of material facts generally.  (Dkt. No. 124, Attach. 1 at 1-4.)  To that effect, only admitted facts and facts to which no proper objection was lodged were relied upon as the factual foundation for the findings herein.  The Justice Center has also urged the court to "disregard" certain exhibits submitted by Gunning because the court has not been supplied "with an adequate foundation to support the admissibility" of said exhibits.  (*Id.* at 2.)  However, the Justice Center has not shown why the evidence it wishes the court to disregard could not be presented in a form that would be admissible at trial.  *See* Fed. R. Civ. P. 56(c)(2); *Emanuel v. Gap, Inc.*, No. 19-CV-03617, 2022 WL 3084317, at *2 (S.D.N.Y. Aug. 3, 2022) ("'The court may consider any material that would be admissible or usable at trial, although the opposing party may specifically object on the ground that the cited materials cannot be presented in a form that *would* be admissible in evidence.'") (citation omitted) (emphasis in original); *see also Paley v. Greenberg*, 16 Fed. R. Serv. 2d 1074 (S.D.N.Y. 1972) (concluding that a motion for summary judgment is not the proper vehicle to determine admissibility of evidence because such determination is properly made at trial).  Therefore, the court does not disregard any exhibits submitted by the parties, to the extent the exhibits would be admissible in evidence at trial.

Cochran, the Justice Center's ethics officer, on June 9, 2016.  (Kiyonaga's SMF ¶ 5.)  On June 13, 2016, Gunning met with Forshaw and Cochran to complain about Kiyonaga's conduct in her office on June 8, 2016 and an alleged sexual relationship that Kiyonaga was engaged in with "D.L.," one of his subordinates.  (*Id.* ¶ 6; Compl. ¶ 27.)

Forshaw and Cochran conducted an investigation to determine whether further action was needed.  (Justice Center's SMF ¶ 37.)  A memorandum was issued to the Director of Human Resources of the Justice Center, dated June 28, 2016, and Forshaw and Cochran called Gunning to discuss the outcome of their investigation.  (*Id.* ¶¶ 42, 44.)  During the telephone call, Gunning expressed concern regarding the appearance of a purported relationship between Kiyonaga and D.L. and its effect on the agency.  (*Id.* ¶ 46.)  Forshaw recommended that, if Gunning was not satisfied with the outcome of the investigation, she could make a report of discrimination or retaliation with the Justice Center's Affirmative Action Officer (AAO), the New York State Division of Human Rights, or the Equal Employment Opportunity Commission (EEOC).  (*Id.* ¶ 47.)  On or about July 18, 2016, Gunning called Elatisha Kirnon, the Justice Center's AAO at the time, for guidance regarding her complaints.  (*Id.* ¶¶ 48-50.)

4

Gunning expressed her concern about the alleged sexual relationship to Kirnon and Kirnon decided to conduct an investigation, treating the call as a complaint.  (*Id.* ¶¶ 51-52.)  On August 17, 2016, Kirnon issued a "Draft Investigation Report," which stated that the subject of the investigation was a "complaint alleging sexual harassment against . . . Kiyonaga."[3]  (*Id.* ¶ 54; Dkt. No. 110, Attach. 33 at 1.)

According to Gunning, Kiyonaga took a series of actions in retaliation for her complaints—defendants deny these alleged facts, contesting the veracity, causation, and the context of Gunning's version of events.  (*See* Gunning's Response to Kiyonaga's SMF ¶¶ 8-19, Dkt. No. 118, Attach. 2)  Specifically, according to Gunning, Kiyonaga took five retaliatory actions against her after her June and July 2016 complaints: (1) he excluded her from meetings with her staff; (2) he removed the Audit and Review Unit from her control in October 2016; (3) he terminated her Strangulation Reduction Initiative; (4) he prohibited her from speaking engagements; and (5) he prevented her from using her former office in the Justice Center's

---

[3]  The Draft Investigation Report concluded, among other findings, "that there was no evidence to show that Kiyonaga was having a sexual relationship with D.L. or that D.L. had been treated preferentially by Kiyonaga."  (Justice Center's SMF ¶ 55.)

Albany location after she transferred to the Bronx[4] location.  (*Id.*)  And, ultimately, Gunning claims that she was forced to resign as the final piece of a retaliatory campaign carried out by Kiyonaga.  (Compl. ¶ 65; Justice Center's SMF ¶ 128.)

On or about January 19, 2017, Denise Miranda began serving as the Acting Executive Director of the Justice Center.  (Justice Center's SMF ¶ 59.)  After Miranda assumed the position of Acting Executive Director, she and Gunning had disagreements, which Gunning attributes to Kiyonaga intentionally making her "look bad" to Miranda.  (*See, e.g.*, Gunning's Response to the Justice Center's SMF ¶¶ 67, 71.)  On April 2, 2017, Gunning submitted a request to change office locations from Albany to the Bronx.  (Justice Center's SMF ¶ 87.)  Gunning's request was approved.  (*Id.* ¶¶ 88-92.)  In early June 2017, Miranda spoke with the Governor's Office about removing Gunning from her position as SPIG.  (*Id.* ¶¶ 94-95.)  And, on June 13, 2017, Miranda sent a text message to Kiyonaga that stated, "[Gunning] is gone after [my] confirmation [as

---

[4] The parties appear to interchangeably refer to the "Albany" office as the "Delmar" office and the "Bronx" office as the "Tarrytown" office.  For the sake of consistency the court will refer to these offices as Albany and Bronx, respectively.

Executive Director]."  (Dkt. No. 118, Attach. 5 at 2.[5])  On August 1, 2017, Gunning was told she had the option to resign from her employment or be terminated—she chose to sign the resignation letter.  (Justice Center's SMF ¶¶ 127-128.)  Gunning, thereafter, filed a charge of discrimination with the EEOC.  (*Id.* ¶ 130.)

According to defendants, Gunning was asked to resign because she was insubordinate on many occasions.  (Gunning's Counter-Statement to the Justice Center's SMF ¶¶ 44-58, Dkt. No. 118, Attach. 2.[6])  Gunning disputes these facts and claims defendants' proffered reasons are merely pretext used to disguise retaliation and discrimination.  (*Id.*)

## B.   Procedural History

In May 2018, Gunning filed a formal charge of discrimination with the EEOC, and received a right to sue letter from the EEOC on or about March 21, 2019.  (Compl. ¶ 6.)  Gunning commenced this action on June 17,

---

[5]  The citation refers to the pagination generated by CM/ECF, the court's electronic filing system.

[6]  The Justice Center disputes many of these assertions in Gunning's counter-statement to its statement of material facts; some of the Justice Center's objections have merit.  (Dkt. No. 124, Attach. 1 at 16-19.)  Without ruling on the admissibility of each individual assertion or resolving the denials thereto, the court references only the parties' positions with respect to these facts, does not determine the truth of the assertions therein, and notes that these issues are in dispute.

2019.  (Compl.)  She asserted a Title VII retaliation claim against the Justice Center, and a retaliation claim pursuant to the Equal Protection Clause against Kiyonaga. (*Id.* ¶¶ 72-73.)  Defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P 12(b)(6).  (Dkt. Nos. 44, 46.) Although not specifically enumerated in the complaint, all parties appeared to assume in their motions to dismiss that a hostile work environment claim was also alleged.  (Dkt. No. 46, Attach. 1 at 14-15; Dkt. No. 47 at 11-14; Dkt. No. 48 at 1-6.)  The court granted in part and denied in part the motions to dismiss.  (Dkt. No. 50.)  A Title VII retaliation claim against the Justice Center and a Section 1983 Equal Protection retaliation claim against Kiyonaga are the only surviving claims.  (*Id.* at 28-29.)  Pending are defendants' motions for summary judgment.  (Dkt Nos. 108, 110.)

### III.  Standard of Review

The standard of review under Fed. R. Civ. P. 56 is well settled and will not be repeated here.  For a full discussion of the governing standard, the court refers the parties to its prior decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. **Discussion**

**A.**   **Section 1983 Retaliation Claim Against Kiyonaga**

Gunning's remaining claim against Kiyonaga is that he violated the Equal Protection Clause "by subjecting her to . . . retaliation for having complained of sex-based discrimination, culminating in the termination of her employment."  (Compl. ¶ 73.)  Kiyonaga moves for summary judgment and argues that Gunning cannot establish a prima facie case of retaliation because she did not engage in any protected activity, and that there is no causal connection between any alleged protected activity and an adverse employment action.  (Dkt. No. 108, Attach. 1 at 4-19.)  Gunning contends that she engaged in protected activity, suffered a series of adverse actions, and that a causal connection between her protected activity and said adverse actions is supported by the record.  (Dkt. No. 118 at 18-22.)

"As in discrimination claims, the elements of a retaliation claim based on an equal protection violation under [Section] 1983 mirror those under Title VII."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015).  Retaliation claims are analyzed under the *McDonnell Douglas* burden shifting framework.  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013); *see also McDonnell Douglas Corp. v. Green*, 411 U.S.

9

792, 802 (1973).  First, though, a plaintiff must establish a prima facie case by demonstrating "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citation omitted).

    *1.   Protected Activity*

    With regard to protected activity, Kiyonaga argues that Gunning's complaints amounted to objections to a "paramour preference"—favoritism that is not protected by Title VII—and that, because a supervisor's preference for their paramour is not a violation of Title VII, Gunning did not have a good-faith belief that she was opposing conduct made unlawful under that statute.  (Dkt. No. 108, Attach. 1 at 5-10.)  Gunning contends that her complaints were made in the "broader context of [Kiyonaga's] sexualized and sexist behavior and comments in the workplace," and that, therefore, a reasonable jury may find that her complaints were protected activity under Title VII.  (Dkt. No. 118 at 8-11.)  Gunning points to five specific activities that she claims were protected: when she (1) sent an email to Kiyonaga, with a copy to Forshaw and Cochran, on June 9, 2016,

regarding the incident that occurred the day before when Kiyonaga

screamed at Gunning in her office; (2) met with Forshaw and Cochran on

June 13, 2016 to discuss how "she believed Kiyonaga was retaliating

against her for complaining about his relationship with . . . D.L., which was

hurting staff morale and was part of a broader pattern of sexist and

sexualized conduct"; (3) "reported her concerns about Kiyonaga, including

his apparent sexual relationship with [D.L.] and his retaliation against her,

[Gunning], to the [Justice Center's AAO], who worked for the Governor's

Officer of Employment Relations (GOER)" in July 2016; and (4) had a

"lengthy one-to-one meeting" with Miranda in late March 2017 regarding

her "concerns about Kiyonaga's sexist and sexualized conduct and the

negative impact it had on the agency."[7]  (Dkt. No. 118 at 4-6, 8-11, 18.)

"A plaintiff engages in 'protected activity' when she '(1) opposes

employment practices prohibited under Title VII; (2) makes a charge of

discrimination; or (3) participates in an investigation, proceeding[,] or

hearing arising under Title VII.'"  *Pace v. Town & Country Veterinary Clinic*

---

[7]   As the Justice Center notes, there is no mention of a March 2017 meeting with Miranda in Gunning's complaint.  (*See generally*, Compl; Dkt. No. 124 at 3.)  The Justice Center's argument that the absence of allegations in the complaint about a March 2017 meeting requires the court to reject these "newly claimed facts and theory" is addressed below, *see infra* Part IV.B.1.

*P.C.*, No. 3:20-CV-279, 2022 WL 3027157, at *3 (N.D.N.Y. Aug. 1, 2022) (citation omitted and alteration in original).  Informal oppositions to discrimination, such as "'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges,'" have been considered forms of protected activity.  *Matima v. Celli*, 228 F.3d 68, 78-79 (2d Cir. 2000) (citation omitted).

To constitute a protected activity, "the plaintiff is required to have had a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII [or Section 1983 Equal Protection]." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks and citations omitted).  And "[m]ere subjective good faith belief is insufficient[;] the belief must be reasonable and characterized by *objective* good faith."  *Id.* at 16-17 (internal quotation marks and citation omitted, emphasis in original). However, a plaintiff "'need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute.'"  *Summa*, 708 F.3d at 126 (quoting *Galdieri-Ambrosini*

12

*v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998)); *see Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 255 (S.D.N.Y. 2005) ("[P]laintiffs need not possess scholarly familiarity with antidiscrimination law in order to satisfy the requirement that they believed in good faith that they had suffered unlawful discrimination.") (citation omitted).

Additionally, "[the Second] Circuit has long since rejected 'paramour preference' claims, which depend on the proposition that 'the phrase "discrimination on the basis of sex" encompasses disparate treatment premised not on one's gender, but rather on a romantic relationship between an employer and a person preferentially [treated].'" *Kelly*, 716 F.3d at 14 (citations omitted); *see DeCintio v. Westchester Cnty. Med. Ctr.*, 807 F.2d 304, 308 (2d Cir.1986) ("Appellees were not prejudiced because of their status as males; rather, they were discriminated against because [their supervisor] preferred his paramour."). That is, a superior's favorable treatment of his or her paramour, to the disadvantage of other employees, "although unfair, simply [does] not violate Title VII [or Section 1983 Equal Protection]." *DeCintio*, 807 F.2d at 308. A paramour preference is distinct from quid pro quo sexual harassment; a paramour preference involves a consensual relationship that happens to result in favorable treatment, while

13

quid pro quo sexual harassment occurs when the receipt of job benefits is *conditioned* on the acceptance of unwanted sexual advances.  *See Fattoruso v. Hilton Grand Vacations Co., LLC*, 873 F. Supp. 2d 569, 579 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 26 (2d Cir. 2013).

Gunning has testified and adduced evidence that she complained, on four different occasions,[8] of Kiyonaga's alleged relationship with D.L. during and after June 2016—complaints she argues were protected activity.  (Dkt. No. 118 at 4-6, 8-11.)  The parties disagree, however, regarding whether Gunning's grievance was limited solely to an allegation that Kiyonaga preferred his purported paramour or whether Gunning was also complaining of sex-based discrimination.  (*Id.*; Dkt. No. 108, Attach. 1 at 5-10.)  Kiyonaga relies on *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, arguing that Gunning could not have had an objective good-faith belief she was complaining of conduct made unlawful by Section 1983 Equal Protection because her complaint was about a "paramour preference" and not sex-based discrimination.  (Dkt. No. 108,

---

[8]  Gunning's complaint contains allegations regarding two complaints made in July 2015, however, these alleged complaints cannot constitute protected activity because (1) "[t]he complaint fails to allege sufficient factual allegations from which the court can plausibly infer that she was engaging in protected activity at this time" and (2) claims based on conduct that occurred before June 2016 are time barred.  (Dkt. No. 50 at 21, n.6 & 23, 28-29.)

Attach. 1 at 7-8.)  In *Kelly*, the plaintiff alleged that one of her superiors

was having an affair with another employee, which resulted in favoritism

towards the alleged paramour and that the plaintiff was retaliated against

for complaining of the alleged affair.  716 F.3d at 12-14.  The Second

Circuit observed that the plaintiff did not allege that the defendants "'took

*any* actions or made any statement[s] that were of a sexual or

gender-specific nature'"—the plaintiff was only complaining that the

superior's consensual relationship with and favoritism for his paramour,

alone, was unlawful discrimination.  *Kelly*, 716 F.3d at 16 (emphasis in

original) (citation omitted).

Here, Gunning testified that she complained of ongoing sexualized

and sexist behavior and comments in addition to her complaint about the

alleged favorable treatment.  (Dkt. No. 118 at 10.)  Moreover, the Draft

Investigation Report regarding Gunning's complaint to the Justice Center's

AAO explicitly states that it was an "[a]nonymous complaint *alleging sexual*

*harassment* against Jay Kiyonaga."  (Dkt. No. 110, Attach. 33 at 1

(emphasis added).  Construed in the light most favorable to Gunning, the

record, therefore, contains evidence that Gunning's complaint was not that

she was discriminated against solely because Kiyonaga preferred D.L., but

15

that she reported what she, and, ostensibly, the Justice Center's AAO,

believed to be quid pro quo sexual harassment—a violation of

antidiscrimination law.  (*Id.*)  For these reasons, Gunning has raised a

triable issue of material fact as to whether she had a good faith belief that

she was reporting conduct made unlawful by Title VII and, consequently,

whether she engaged in protected activity.  S*ee Lamberson v. Six W.*

*Retail Acquisition, Inc.*, 122 F. Supp. 2d 502, 511 (S.D.N.Y. 2000) (denying

summary judgment on retaliation claim because of the existence of issues

of material fact as to whether the plaintiff engaged in protected activity and

because "the record contain[ed] evidence that defendants interpreted" the

complaint to be that the plaintiff believed his employer was engaging in

unlawful discrimination).

    *2.   Adverse Action*

Gunning contends that a reasonable jury may find that shortly after

her alleged protected activity, Kiyonaga, as her supervisor, took a series of

adverse actions against her because Kiyonaga:

> excluded [her] from meetings that he held with her
> staff; ended a major safety initiative (the Strangulation
> [Reduction] Initiative) which she was spearheading;
> told her that she could no longer speak to outside
> groups, though that had been a regular part of her job

> as the agency's SPIG; . . . removed a substantial part
> of the Inspector General's staff (the Audit & Review
> Unit) from [her] supervision[; and prevented her from
> using her former office in Albany after she relocated
> to the Bronx]

(Dkt. No. 118 at 16-20.)  Kiyonaga argues that Gunning has not shown she

suffered an adverse employment action other than her constructive

termination.  (Dkt. No. 108, Attach. 1 at 10-15.)  Specifically, Kiyonaga

argues that (1) Gunning has not provided any evidence establishing she

was excluded from any meetings; (2) the removal of certain of Gunning's

staff was due to the conduct of another person; (3) Gunning's

Strangulation Reduction Initiative was discontinued because outside

agencies declined to participate; (4) he never barred Gunning from

speaking engagements; and (5) he did not prevent Gunning from using an

office in Albany.  (*Id.*)

"[A] plaintiff may recover for retaliation by 'show[ing] that a

reasonable employee would have found the challenged action *materially*

*adverse*, which *in this context means it well might have dissuaded a*

*reasonable worker from making or supporting a charge of discrimination*.'"

*Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 43 (2d Cir. 2019) (citing

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)

(hereinafter "*Burlington*").).)[9]  "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence," as Section 1983 Equal Protection "[does] not set forth a general civility code for the American workplace."  *Burlington*, 548 U.S. at 68 (internal quotation marks and citations omitted); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining that judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'") (citation omitted).  Acts of retaliation must, however, "be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) (internal quotation marks and citation omitted).

    As for the alleged adverse actions individually: first, Gunning has

---

[9]  "Since [*Burlington*], the Second Circuit has recognized that 'the harm element of a retaliation claim is not to be analyzed in the same way as the harm from an alleged substantive act of discrimination."  *Ahmad v. N.Y.C. Health & Hosps. Corp.*, No. 20 CIV. 675, 2021 WL 1225875, at *26 (S.D.N.Y. Mar. 31, 2021) (quoting *Davis-Garett*, 921 F.3d at 43-44).  "Instead, the proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination."  *Id.* (internal quotation marks and citation omitted).

testified that Kiyonaga prevented her from attending meetings with her staff, but she could not provide information as to when any of these meetings occurred, which of her staff attended them, or even give an estimate of the frequency or total number of said meetings.  (Dkt. No. 118, Attach. 15 at 108:11-117:16.)  Gunning was not prevented from meeting with her staff on her own accord; indeed, she still met with her staff weekly, "if not more [often]," throughout period of June 8, 2016, her first complaint, and August 1, 2017, her constructive termination.  (*Id.* at 115:8-17.)  Gunning's vague and unsupported allegation that she was prevented from attending impromptu meetings that occurred between members of her staff and her supervisor—which she cannot identify with any degree of specificity—is insufficient to constitute a materially adverse employment action.  *See Moore v. Abbott Lab'ys*, 780 F. Supp. 2d 600, 621 (S.D. Ohio 2011) ("[Plaintiff] vaguely asserts he was not invited to an unknown number of what were apparently impromptu meetings.  Such evidence does not demonstrate an adverse employment action on the basis of exclusion from meetings.") (citations omitted); *Watson v. City of Cleveland*, 202 F. App'x 844, 855 (6th Cir. 2006) (holding that a plaintiff's exclusion from some meetings, even in the context of other alleged adverse actions, would not

dissuade a reasonable employee from invoking the protections of Title VII).

Second, although Kiyonaga has argued that the alleged removal of the Audit and Review Unit from Gunning's supervision in October 2016, the alleged termination of the "Strangulation Reduction Initiative," and the alleged barring of Gunning from speaking engagements[10] that were part of her duties as SPIG were not done in retaliation to Gunning's protected activity, or that they did not occur as Gunning has characterized them, he has not met his burden of showing that these actions, if they occurred as Gunning alleges, would not dissuade a reasonable person from making or supporting a charge of discrimination.  (Dkt. No. 108, Attach. 1 at 12-14.) As Gunning has contended these three activities were a large part of her role as SPIG, (Dkt. No. 118 at 19-20), it is conceivable that restrictions or bars placed on them could have dissuaded a reasonable person in her position from invoking the protections of Section 1983 Equal Protection.

---

[10]   Kiyonaga's sole argument regarding the allegation that he barred Gunning from speaking engagements is that he denies it occurred.  (Dkt. No. 108, Attach. 1 at 14; Dkt. No. 122 at 9.)  Gunning's interrogatory response and her testimony conflict with regard to which speaking events she was unable to attend; however, the resolution of these inconsistencies and the dispute over whether Gunning was actually prevented from attending any events are best suited for trial. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.")

Third, the record shows that Gunning's inability to use her former office in Albany after her transfer to the agency's Bronx location cannot qualify as an adverse action.  Gunning made the request to move locations herself, (Dkt. No. 108, Attach. 17 at 1), her request was to "change [her] duty station" and did not indicate that she wished to maintain her office in Albany in addition to an office in the Bronx, (*id.*), she testified that no employee besides the Executive Director was permitted to maintain a permanent office in multiple locations, (Dkt. No. 108. Attach. 9 at 158:4-159:15), and she admittedly received the same treatment as other visiting staff members in the Albany location, (*id.* at 159:8-15).[11]  Based on the record evidence, it would not be reasonable for Gunning to expect to maintain multiple offices, and being treated the same as other visiting employees would not dissuade a reasonable person from invoking the protections of Section 1983 Equal Protection.  For these reasons, Gunning has raised triable issues of fact as to whether adverse actions occured.

    *3.*   *Causal Connection*

---

[11]  Additionally, the Director of Financial Administration for the Justice Center noted in an email to Miranda and Kiyonaga that he could "designate a cubicle, similar to the arrangement we have for Perry [Cerrato], to accommodate [Gunning's] return trips to [Albany]."  (Dkt. No. 108, Attach. 18 at 1.)  This is further proof, beyond Gunning's own admission, that she was treated identically to similarly situated employees.

Kiyonaga contends that Gunning has not established a causal connection between her protected activity and the alleged adverse actions. (Dkt. No. 108, Attach. 1 at 16-20.)  Gunning argues that a jury could find temporal proximity that would support a causal connection by inference. (Dkt. No. 118 at 20-22.)

"[E]ven without direct evidence of causation, 'a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action.'"  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (citation omitted).  "'There is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference.'"  *Kraiem v. JonesTrading Inst. Servs. LLC*, No. 1:19-cv-05160, 2021 WL 5294066, at *5 (S.D.N.Y. Nov. 12, 2021) (citations omitted).  The Second Circuit has, however, previously held that a period of five months is not too long to find the requisite causal relationship.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

Gunning's protected activity occurred in June and July of 2016. (Dkt. No. 118 at 4-6, 8-11, 18.)  And her allegations as to four adverse

actions survive Kiyonaga's motion: the first being the removal of the Audit and Review Unit from her supervision in October 2016, (Dkt. No. 118, Attach. 8), and the last being her constructive termination in August 2017. (Kiyonaga's SMF ¶ 2).  Kiyonaga's directive that Gunning was not to attend speak engagements for outside agencies and termination of her Strangulation Reduction Initiative occurred sometime in the interim, in the "fall of 2016."  (Dkt. No. 118, Attach. 15 at 140:2-153:23).  The approximate three-month period between Gunning's protected action and the first instance of alleged retaliation is sufficiently close to make a prima facie showing of causation indirectly through temporal proximity.[12]

### 4.   *McDonnell-Douglas Burden Shifting*

Kiyonaga offers non-retaliatory reasons for his actions.  (Dkt. No. 108, Attach. 1 at 12-14.)  But, Gunning contends that a jury could find evidence of pretext and retaliatory animus.  (Dkt. No. 118 at 20-22.)

"Once a prima facie case of retaliation is established, the burden . . .

---

[12]  In addition, "where 'an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 573 (S.D.N.Y. 2010) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  Gunning's declaration and deposition contain circumstantial proof of discrimination by Kiyonaga which, if believed by a finder of fact, could support a finding of discrimination.  (*See, e.g.*, Dkt. No. 118, Attach. 3 at ¶¶ 6A, 19, 21.)

23

shifts to the employer to demonstrate that a legitimate, non[-retaliatory] reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (citation omitted); *see Cox v. Onondaga Cnty. Sheriff's Dept.*, 760 F.3d 139, 145 (2d Cir. 2014). "If the employer demonstrates a legitimate, non-discriminatory reason, then '[t]he burden shifts . . . back to the plaintiff," *Summa*, 708 F.3d at 125 (quoting *Raniola*, 243 F.3d at 625), who must demonstrate "that the [employer's] stated rationale is mere pretext," *Cox*, 760 F.3d at 145 (citation omitted). To demonstrate this, a plaintiff must show that retaliation was a "but for" cause of her adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). To show but-for causation, a plaintiff does not need to "pro[ve] that retaliation was the only cause of the employer's action, but . . . that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846.

Kiyonaga has offered non-discriminatory reasons as to why the Strangulation Reduction Initiative was ended and why the Audit and Review Unit was removed from Gunning's control: outside agencies declined to participate in the initiative and Cerrato's conduct required the unit be moved, respectively. (Dkt. No. 108, Attach. 1 at 12-14.) However,

Gunning has pointed to inconsistencies and weaknesses in these reasons, including that Kiyonaga's claim that Forshaw and Cochran recommend that the Audit and Review Unit be removed from her control is not precisely true, as the document Kiyonaga relies upon shows that Forshaw and Cochran recommended that Cerrato and the complaining employee attend mediation and were split about whether Cerrato should continue to act as a supervisor.  (Dkt. No. 108, Attach. 13 at 12-13.)  None of the recommendations included removing the unit from Gunning's supervision as SPIG, as Kiyonaga claims.  (*Id.*)  This inconsistency and weakness raised by Gunning, coupled with the parties' conflicting evidence regarding whether Gunning was actually barred from speaking engagements, create triable issues of fact with respect to whether Kiyonaga's reasons were pretext for retaliation, and, therefore, preclude summary judgment.  *See Kwan*, 737 F.3d at 845 ("A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.") (citation omitted).

25

**B.**    **Title VII Retaliation Claim Against the Justice Center**

The Justice Center moves for summary judgment with respect to Gunning's Title VII retaliation claim.  (Dkt. No. 110, Attach. 34 at 14-30.) Specifically, the Justice Center argues that Gunning cannot establish a prima facie case of retaliation because she did not engage in any protected activity and that there is no causal connection between any alleged protected activity and an adverse employment action.  (*Id.*)  The Justice Center further asserts that summary judgment is appropriate because Gunning was ultimately terminated for legitimate, non-retaliatory reasons. (*Id.* at 24-30.)  Gunning argues that "the evidence reflects that Miranda first conferred with Kiyonaga about terminating Plaintiff's employment just a few days after Plaintiff met with her and expressed her concerns about Kiyonaga's sexualized and sexist conduct" in March 2017.  (Dkt. No. 118 at 13.)  Gunning further argues that the temporal proximity between her protected activity and the adverse employment action—her constructive termination on June 17, 2017—establishes a causal connection.  (*Id.* at 11-17.)  Finally, Gunning asserts that the Justice Center's proffered legitimate reasons for her termination were pretext for retaliation.  (*Id.* at 12-16.)

As discussed above, a plaintiff claiming retaliation, as relevant here,

26

must demonstrate "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Littlejohn*, 795 F.3d at 315-16 (citation omitted).

### 1.    Protected Activity

For the same reasons articulated above, *see supra* Part.IV.A.1, Gunning has sufficiently made a prima facie showing that she engaged in protected activity when she complained to Forshaw and Cochran on June 9 and 13, 2016 and to Kirnon in July of 2016.

However, the Justice Center also argues that the complaint did not contain any allegations regarding a March 2017 meeting between Gunning and Miranda and, therefore, these "newly claimed facts and theory must be rejected by the [c]ourt." (Dkt. No. 124 at 3-4.)  Although Gunning made no mention of a March 2017 meeting in the complaint or in her response to Kiyonaga's and the Justice Center's motions to dismiss, (Compl.; Dkt. No. 47), she testified about it during her deposition, (Dkt. No. 110, Attach. 4 at 198:6-204:23), and mentioned it in her interrogatory responses, (Dkt. No. 110, Attach. 20 ¶ 12).  These alleged facts were available to defendants

prior to summary judgment briefing and they are not at odds with Gunning's other allegations. *See, e.g.*, *Saleemi v. Pencom Sys. Inc.*, No. 99 CIV. 667, 2000 WL 640647, at *3 (S.D.N.Y. May 17, 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000) (rejecting new theory raised in opposition to summary judgment because it was *inconsistent* with pleadings, deposition testimony, and interrogatory responses). The cases upon which the Justice Center relies do not contemplate the situation at hand where "new" facts were mentioned in interrogatory responses and deposition testimony, instead, the cases involve facts and theories mentioned for the first time during summary judgment motion practice. *See Fixed Income Shares: Series M v. Citibank N.A.*, 314 F. Supp. 3d 552, 558 (S.D.N.Y. 2018); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006); *Slade v. Alfred Univ.*, No. 11-CV-396, 2013 WL 6081710, at *3 (W.D.N.Y. Nov. 19, 2013). Additionally, Federal Rule of Civil Procedure 8(a)(2) articulates a notice pleading standard which "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). Discovery is a tool intended to provide additional factual detail in support of a party's claims. *See Adidas Am., Inc. v. Thom Browne Inc.*, 599 F. Supp. 3d 151,

28

157 (S.D.N.Y. 2022).  The complaint put defendants on notice of Gunning's allegations that she was retaliated against in violation of Title VII and Section 1983 and that she would be producing evidence to show that she met the elements of these claims, including evidence of protected activity. (Compl. ¶¶ 6-73.)  For these reasons, the court does not outright reject Gunning's allegations regarding the alleged March 2017 meeting with Miranda, despite the fact that it was not explicitly mentioned in the complaint.

### 2.   *Adverse Action*

The Justice Center does not dispute, for the purposes of this motion, that Gunning suffered an adverse action when she was given the option to either resign her employment or be terminated on August 1, 2017.  (Dkt. No. 110, Attach. 34 at 15.)  And Gunning has limited the scope of her Title VII claim, conceding that her constructive termination is "the sole adverse action underlying her Title VII claim against the Justice Center."  (Dkt. No. 118 at 13.)

### 3.   *Causal Connection*

The Justice Center argues that Gunning cannot prove a causal

connection because there is no evidence that Miranda harbored a retaliatory animus and the temporal proximity between her complaints about Kiyonaga and her constructive termination is too remote.  (Dkt. No. 110, Attach. 34 at 23-24.)  Gunning contends that a reasonable jury may find a causal connection because she has adduced evidence of close temporal proximity between a complaint she made to Miranda and Miranda's decision to terminate her, along with evidence of pretext, an ongoing campaign of adverse action, as well as retaliatory animus.  (Dkt. No. 118 at 12-17.)

Gunning points to a text message conversation between Kiyonaga and Miranda, which she claims occurred days after her March 2017 complaint, wherein Miranda, according to Gunning, sought advice regarding terminating Gunning.  (*Id.* at 13.)  However, Gunning's contention that a single text message from Miranda, which explicitly states Miranda was "not going down [the] path [of terminating]" Gunning at that point, constitutes an adverse action from which temporal proximity can be measured, is unconvincing.  (*Id.*)  The evidence is not conclusive, at this stage, as to whether the March 30, 2017 text message was the point at which Miranda decided to terminate Gunning; indeed, the words of the text

message could reasonably indicate that Miranda had not yet decided to terminate Gunning on that date.  (Dkt. No. 118, Attach. 5 at 4.)  The question of when Miranda decided to terminate Gunning is a triable issue of fact.

Additionally, construing the evidence in the light most favorable to Gunning, the temporal proximity between the protected activity of her late March 2017 conversation with Miranda and the adverse action of her constructive termination approximately four months later is sufficient, at this stage, to raise an inference of retaliation.  *See Gorzynski*, 596 F.3d at 110.  Moreover, given the context of Gunning's testimony and allegations regarding a campaign of acts of retaliation against her during this time period, issues of fact have been presented.  *See Stern v. Trustees of Columbia Univ. in City of N.Y.*, 131 F.3d 305, 313-14 (2d Cir. 1997) ("Where the plaintiff has presented evidence sufficient to support an inference of impermissible discrimination . . . triable issues of fact are presented.");  *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . .").

    4.    *Non-Retaliatory Reasons and Pretext*

Finally, the Justice Center offers non-retaliatory reasons for its action: Gunning's insubordination, which included (1) Gunning's issuance of the Residential Mental Health Unit (RMHU) Report without prior approval; (2) Gunning's attempt to issue press releases in her own name, or in the name of her office, in contravention to Miranda's direction; and (3) a fundamental disagreement between Miranda and Gunning regarding the sharing of grand jury information.  (Dkt. No. 110, Attach. 34 at 24-26.) Gunning argues that the reasons set forth by the Justice Center are mere pretext and that the decision to terminate her had been made prior to the disagreement regarding the sharing of grand jury information and the implementation of Miranda's press policies that Gunning purportedly violated.  (Dkt. No. 118 at 11-17.)

Temporal proximity alone is insufficient to demonstrate pretext, but a plaintiff may rely on temporal proximity, "together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage."  *Kwan*, 737 F.3d at 847.

Although the evidence does not show that Miranda had decided to terminate Gunning on March 30, 2017, *see supra* Part.IV.B.3, Miranda sent a text message to Kiyonaga on June 13, 2017 that stated, "[Gunning] is

32

gone after [my] confirmation." (Dkt. No. 118, Attach. 5 at 2.[13])  Miranda

testified that this message was relaying a conversation that she had with

an employee of the Governor's Office at some earlier point, but she does

not remember when the conversation occured.  (Dkt. No. 118, Attach. 16 at

55:21-57:23.)  The "fundamental disagreement", (Dkt. No. 124 at 11),

between Miranda and Gunning regarding Gunning's refusal to share grand

jury information purportedly came to a head on July 13, 2017 and during

the days prior.  (Dkt. No. 110, Attach. 13 at 1 (email from Justice Center

employee memorializing meeting with Gunning, Forshaw, and Miranda,

recalling that "[Miranda] mentioned the purpose of the meeting was to

follow up on your discussion with her from earlier in the week about [grand

jury] information.").)  Therefore, construing the evidence in the light most

favorable to Gunning, the "fundamental disagreement" occurred

approximately *a month* after Miranda had already decided to terminate

Gunning.  (Dkt. No. 118, Attach. 5 at 2; Dkt. No. 110, Attach. 13 at 1.)  The

Justice Center's reliance on a dispute that occurred approximately a month

after Miranda's decision to terminate Gunning was already made

---

[13]  The citation refers to the pagination generated by CM/ECF, the court's electronic
filing system.

"'suggests that [d]efendants' non[-]discriminatory reasons were not the real reasons for . . . terminating . . .'" Gunning.  *Colistra v. Cairo-Durham Cent. Sch. Dist.*, No. 616CV01053, 2018 WL 4211909, at *17 (N.D.N.Y. Sept. 4, 2018) (quoting *Hall v. N. Bellmore Sch. Dist.*, 55 F. Supp. 3d 286, 300 (E.D.N.Y. 2014)).

There is other evidence in the record that shows that Miranda's press release policy, which the Justice Center claims Gunning violated by issuing press releases in her own name or in the name of her office, may not have been officially implemented until after Miranda was confirmed on June 17, 2017.  (Dkt. No. 110, Attach. 26 at 2.)  Miranda states in her declaration that she gave her direction that all press releases were to be issued in her name before she was confirmed.  (Dkt. No. 110, Attach. 22 ¶ 13.) However, Gunning's position is that the press-release policy was not official until after Miranda was confirmed as Executive Director—which occured after Miranda made the decision to terminate Gunning—and that the Justice Center has offered no proof that she violated the policy after it was officially implemented.  (Dkt. No. 118 at 14-15.)  This weakness in the Justice Center's proffered non-retaliatory reasons provides a discrepancy, from which "a reasonable juror could conclude that the explanations were a

34

pretext for a prohibited reason." *Kwan*, 737 F.3d at 846.

Therefore, given the myriad of disputed issues of fact, summary

judgment is inappropriate.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Justice Center's motion for summary judgment

(Dkt. No. 110) is **DENIED**; and it is further

**ORDERED** that Kiyonaga's motion for summary judgment (Dkt. No.

108) is **DENIED**; and it is further

**ORDERED** that this case is deemed trial ready and a trial scheduling

order will be issued in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

December 18, 2023
Albany, New York

Gary L. Sharpe
U.S. District Judge